UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>     Plaintiff,<br><br> v.<br><br>The UNITED STATES DEPARTMENT OF THE NAVY, an agency within the United States Department of Defense; MARK T. ESPER, in his official capacity as Acting United States Secretary of Defense; RICHARD V. SPENCER, in his official capacity as Secretary of the Navy; TODD C. MELLON, in his official capacity as Acting Assistant Secretary of the Navy, Energy, Installations & Environment; and CAPTAIN MATTHEW L. ARNY, in his official capacity as Commanding Officer of Naval Air Station Whidbey Island,<br><br>     Defendants. | NO.<br><br>STATE OF WASHINGTON'S COMPLAINT |

## I.   INTRODUCTION

1. The State of Washington challenges the United States Navy's Record of Decision, signed on March 12, 2019, and the associated Final Environmental Impact Statement published on September 28, 2018, which authorize an approximate 33 percent increase in the Navy's EA-18G Growler aircraft operations at Naval Air Station Whidbey Island. Washington further challenges the Navy's March 8, 2019 Section 106 determination. Washington brings this case under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4370m-12,

STATE OF WASHINGTON'S
COMPLAINT

1

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

the National Historic Preservation Act (NHPA), 54 U.S.C. §§ 300101–307108, and the Administrative Procedure Act (APA), 5 U.S.C. § 551–706.

2.      The Navy's Record of Decision expands the Navy's operations of EA-18G Growler aircrafts by adding 36 aircrafts and 628 Navy personnel to NAS Whidbey Island and increasing annual airfield operations at the Whidbey Island Complex to more than 112,000 operations annually. EA-18G Growlers, which provide electronic warfare capabilities, are the loudest aircraft currently operating at Naval Air Station Whidbey Island.

3.      The Navy's expansion of EA-18G Growler operations will significantly impact the people, landscape, and wildlife of Whidbey Island and the broader region. The increased noise from Growler operations will adversely affect public health, public schools, and historic areas, including the Central Whidbey Island Historic District and Ebey's Landing National Historical Reserve. In addition, Growler flights threaten to disturb habitat for various bird species, including marbled murrelets and tufted puffins, other terrestrial wildlife, and marine mammals, including harbor seals.

4.      Given these significant potential impacts of the Navy's Growler expansion, federal law requires the Navy to take a hard look at the environmental impacts of its proposed action and carefully consider impacts to historic resources and mitigation measures to reduce those impacts. As part of the environmental and historic review processes, Washington state agencies and officials expressed concerns regarding the public health, environmental, and historic impacts associated with the Growler program.

5.      Washington recognizes the important role of the Navy in protecting national security, ensuring military readiness, and keeping our troops safe abroad. However, Washington seeks to ensure that the Navy complies with applicable federal laws in operating its training programs in the state. Accordingly, Washington files this lawsuit to compel Defendants to comply with NEPA, the APA, and the NHPA in connection with its Record of

STATE OF WASHINGTON'S
COMPLAINT                                          2                    ATTORNEY GENERAL OF WASHINGTON
                                                                              Counsel for Environmental Protection
                                                                                 800 Fifth Avenue STE 2000
                                                                                    Seattle, WA 98104
                                                                                     (206) 464-7744

1  Decision, EIS, and Section 106 decision authorizing expanded EA-18G Growler operations at

2  Naval Air Station Whidbey Island.

3  ## II.    JURISDICTION

4  6.      This action arises under the National Environmental Policy Act,

5  42 U.S.C. §§ 4321–4370m-12, its implementing regulations, adopted by the Council on

6  Environmental Quality (CEQ) and applicable to all agencies (CEQ NEPA Regulations),

7  40 C.F.R. Parts 1500–1508, and the Navy's implementing regulations, 32 C.F.R. Part 775, the

8  Administrative Procedure Act, 5 U.S.C. §§ 551–706, and the National Historic Preservation

9  Act, 54 U.S.C. §§ 300101–307108, and its implementing regulations, 36 C.F.R. Part 800. This

10  Court has jurisdiction over Washington's claims pursuant to 28 U.S.C. § 1331 (action arising

11  under the laws of the United States) and 5 U.S.C. §§ 701–706 (Administrative Procedure Act).

12  An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a),

13  and the Court may issue declaratory and injunctive relief under 28 U.S.C. §§ 2201–02 and

14  5 U.S.C. §§ 705–706.

15  7.      The United States has waived sovereign immunity for claims arising under the

16  APA. 5 U.S.C. § 702.

17  8.      Washington is a "person" within the meaning of 5 U.S.C. § 551(2), authorized

18  to bring suit under the APA to challenge unlawful final agency action. 5 U.S.C. § 702.

19  9.      Because NEPA and the NHPA do not have a private cause of action, claims

20  challenging NEPA or NHPA violations are reviewed under the APA. *Pit River Tribe v. U.S.*

21  *Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006).

22  10.      By commenting on the Draft Environmental Impact Statement and participating

23  in the NHPA process, Washington has exhausted all available administrative review processes.

24  11.      The Navy's Record of Decision for the Final Environmental Impact Statement

25  (EIS) for EA-18G "Growler" Airfield Operations at Naval Air Station Whidbey Island

26  Complex is a final agency action subject to review under the APA.

STATE OF WASHINGTON'S
COMPLAINT

3

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

### III.   VENUE

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because this is a civil action in which officers or employees of the United States or an agency thereof are acting in their official capacity or under color of legal authority and a substantial part of the events or omissions giving rise to Washington's claims occurred within this judicial district.

### IV.   PARTIES

13.     Plaintiff State of Washington is a sovereign entity and brings this action to protect its own quasi-sovereign and proprietary rights. The Attorney General is the chief legal advisor to the State of Washington. The Attorney General's powers and duties include acting in federal court on matters of public concern. This challenge is brought pursuant to the Attorney General's independent constitutional, statutory, and common law authority to bring suit and obtain relief on behalf of the State of Washington based on impacts to the state's proprietary interests. This challenge is also brought pursuant to the Attorney General's authority to bring actions under Washington's interest, as *parens patriae*, in the general health and well-being of its residents.

14.     States have a unique role in the NEPA and NHPA processes. The Navy's regulations implementing NEPA encourage "[c]lose and harmonious planning relations with … states, for cooperation and resolution of mutual land use and environment-related problems." 32 C.F.R. § 775.10. Under the NHPA, the Navy is required to consult with the State Historic Preservation Officer to develop and evaluate alternatives or modifications to the proposed action that could avoid, minimize, or mitigate adverse effects on historic properties. 54 U.S.C. § 302303; 36 C.F.R. § 800.2(c)(1); 36 C.F.R. § 800.6(a). Washington interests are thus protected by NEPA and the NHPA.

15.     The Navy's expansion of its EA-18G Growler operations will directly harm Washington's interests in the health, safety, and welfare of its residents. The Navy's expansion will also directly impact Washington's proprietary interest in the state's wildlife, state parks,

STATE OF WASHINGTON'S
COMPLAINT

4

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

and public schools. The area impacted by this expansion and the increased noise it will generate includes at least ten public schools, seven state parks, important areas for bird habitat, important state historic sites, and state-owned tidelands and waterways. The expanded Growler operations will adversely impact the Central Whidbey Island Historic District and Ebey's Landing National Historical Reserve, which Washington State Parks collaboratively manages with Island County, the Town of Coupeville, and the National Park Service as a member of the Ebey's Landing Trust Board. The Navy's expanded Growler operations will also adversely impact Washington's wildlife, including threatened marbled murrelets, tufted puffins, migratory birds, harbor seals, fish, and other wildlife. Washington has expended significant resources to preserve state and federal threatened and endangered species like the marbled murrelet and the tufted puffin and to manage the health of its migratory bird, fish, and wildlife populations. Washington's interests will be harmed by the Navy's expanded Growler operations, which will increase noise disruption on state lands and in public schools, increase impacts to wildlife from Growler operations, and increase impacts to important state historic sites.

16.     Washington also has a procedural interest in the Navy's decision to expand Growler operations at the Whidbey Island Complex because the state participated in the administrative review process. Several state agencies, including the Washington Department of Fish and Wildlife, the Washington Department of Health, the Washington Department of Ecology, and the Washington State Historic Preservation Office participated in the Navy's review of environmental and historic impacts of an expanded Growler program. Through this participation, Washington expressed its interest in the Navy's compliance with its environmental review obligations under NEPA and its historic preservation obligations under the NHPA. The Navy's failure to comply with NEPA in developing the challenged EIS and the Navy's failure to reach a reasoned decision on preserving historical sites affected by its

STATE OF WASHINGTON'S
COMPLAINT

5

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

expanded Growler operations harms Washington's procedural and substantive interest. *See Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 816 (9th Cir. 2017).

17.     Preparation of a legally sufficient environmental impact statement that takes a hard look at these impacts to the State's proprietary and quasi-sovereign interests will provide additional information that could result in a different final decision from the Navy on how it will operate its Growler program at the Whidbey Island Complex. In addition, the Navy's reasonable consideration of mitigation measures to better protect historic resources in the action area will reduce adverse impacts to historic resources in the state. This review will also remedy the procedural harms to the state. *See Ctr. for Biological Diversity*, 868 F.3d at 816; *Citizens for Clean Energy v. U.S. Dep't of the Interior*, __ F.Supp.3d__, Case Nos. CV-17-30-GF-BMM and CV-17-42-FG-BMM, 2019 WL 1756296, at *3–*5 (D. Mont. Apr. 19, 2019) (Washington and other states have standing to bring NEPA challenge). Accordingly, Washington has standing to bring this action.

18.     Defendant United States Navy is an agency within the United States Department of Defense subject to the authority, direction and control of the Acting Secretary of Defense.

19.     Defendant Dr. Mark T. Esper is Acting United States Secretary of Defense and is named as a defendant in his official capacity.

20.     Defendant Richard V. Spencer is the Secretary of the Navy and is named as a defendant in his official capacity. Secretary Spencer is responsible for the Navy's Section 106 decision under the NHPA. 54 U.SC. § 306114.

21.     Defendant Todd C. Mellon is the Acting Assistant Secretary of the Navy, Energy, Installations & Environment and is named in his official capacity. Acting Assistant Secretary Mellon replaced Phyllis L. Bayer who resigned on March 30, 2019 after signing the Record of Decision challenged in this action. Acting Assistant Secretary Mellon is responsible for enhancing combat capabilities for the warfighter and greater energy security; the

STATE OF WASHINGTON'S
COMPLAINT

6

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

1  acquisition and disposal of real property; construction and maintenance of installations;

2  protecting the safety and occupational health of the military and civilian personnel;

3  environmental protection, planning and restoration ashore and afloat; and conservation of

4  natural and cultural resources.

5      22.     Defendant Captain Matthew L. Arny is the Commanding Officer of Naval Air

6  Station Whidbey Island and is named in his official capacity.

7  ## V.      STATUTORY AND REGULATORY BACKGROUND

8  **National Environmental Policy Act**

9      23.     NEPA is the "basic national charter for protection of the environment." 40

10  C.F.R. § 1500.1. "NEPA requires that a federal agency consider every significant aspect of the

11  environmental impact of a proposed action and inform the public that it has indeed considered

12  environmental concerns in its decisionmaking process." *Pit River Tribe v. U.S. Forest Serv.*,

13  469 F.3d 768, 781 (9th Cir. 2006) (quoting *Earth Island Inst. v. U.S. Forest Serv.,* 442 F.3d

14  1147, 1153–54 (9th Cir. 2006)). "The NEPA process is intended to help public officials make

15  decisions that are based on understanding of environmental consequences, and take actions that

16  protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c). The Council on

17  Environmental Quality ("CEQ") promulgated rules implementing NEPA, which apply to all

18  federal agencies, including the Navy. *See* 40 C.F.R. pt. 1500.

19      24.     For "major Federal actions significantly affecting the quality of the human

20  environment," federal agencies must prepare an environmental impact statement. 42 U.S.C.

21  § 4332(C). CEQ regulations define "major federal actions" to include "new and continuing

22  activities" with "effects that may be major and which are potentially subject to federal control

23  and responsibility." 40 C.F.R. § 1508.18. For purposes of NEPA, the "human environment"

24  includes "the natural and physical environment" as well as "the relationship of people with that

25  environment." *Id.* § 1508.14.

26

STATE OF WASHINGTON'S
COMPLAINT                                    7                    ATTORNEY GENERAL OF WASHINGTON
                                                                      Counsel for Environmental Protection
                                                                      800 Fifth Avenue STE 2000
                                                                      Seattle, WA 98104
                                                                      (206) 464-7744

25.     An EIS must contain a detailed discussion of direct, indirect, and cumulative environmental impacts, *Id.* §§ 1508.7, 1508.8; 1502.16, and appropriate measures to mitigate adverse environmental impacts, *Id.* §§ 1502.14, 1502.16. *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206 (9th Cir. 2004). Impacts or effects of a proposed action include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative." *Id.* § 1508.8. An agency must ensure the "professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements" and "shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other resources relied upon for conclusions in the statement." *Id.* § 1502.24. NEPA's implementing regulations also require that an agency address "appropriate mitigation measures not already included in the proposed action or alternatives." *Id.* § 1502.14(f); *see also id.* § 1502.16(h).

26.     In addition, a final EIS should respond to comments received on the draft EIS by, among other options, supplementing, improving, or modifying the analysis or explaining why the comments do not warrant further agency response, citing the sources, authorities, or reasons which support the agency's position. *Id.* § 1503.4(a).

**National Historic Preservation Act**

27.     "[T]he fundamental purpose of the NHPA is to ensure the preservation of historical resources." *Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 608 F.3d 592, 609 (9th Cir. 2010). Consistent with this purpose, Section 106 of the NHPA requires federal agencies to consider the effects of federal undertakings on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register prior to approving the undertaking. 54 U.S.C. § 306108; 36 C.F.R. § 800.1. "An adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would

STATE OF WASHINGTON'S
COMPLAINT

8

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." 36 C.F.R. § 800.5(a)(1). If an agency finds that an adverse effect will occur, then the agency shall engage in further consultation to resolve adverse effects to historic properties through avoidance, minimization, or mitigation. *Id.* §§ 800.5(a)(2), 800.6(b); 800.8(c)(1)(v).

28.     "Like NEPA, '[s]ection 106 of NHPA is a "stop, look, and listen" provision that requires each federal agency to consider the effects of its programs." *Te-Moak Tribe of W. Shoshone of Nev.*, 608 F.3d at 607.

29.     State historic preservation officers serve as a consulting party in the Section 106 process by advising and assisting federal agencies "to ensure that historic property is taken into consideration at all levels of planning and development." 54 U.S.C. § 302303(b)(6); 36 C.F.R. §§ 800.2(c)(1); 800.6(a). Agencies should initiate consultation "early in the undertaking's planning, so that a broad range of alternatives may be considered during the planning process for the undertaking." *Pit River Tribe*, 469 F.3d at 787 (quoting 36 C.F.R. § 800.1(c)).

30.     If the action agency and consulting parties are unable to agree on how adverse effects will be resolved, consultation may be terminated if further consultation would not be productive. 36 C.F.R. § 800.7(a). Where the action agency terminates consultation, the head of the agency shall request comments from the Advisory Council on Historic Preservation and consider those comments in reaching a final decision on the undertaking. *Id.* § 800.7(c)(4). A final decision on the undertaking must summarize the decision, provide rationale for the decision, and demonstrate consideration of the Council's comments. *Id*.

31.     The NHPA's implementing regulations encourage federal agencies to coordinate Section 106 compliance with the NEPA process. 36 C.F.R. § 800.8.

**Administrative Procedure Act**

32.     Judicial review of agency decisions under NEPA and the NHPA occurs under the Administrative Procedure Act. *Pit River Tribe*, 469 F.3d at 778.

STATE OF WASHINGTON'S
COMPLAINT

9

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

33.     The Administrative Procedure Act, 5 U.S.C. §§ 551–706, governs the procedural requirements for agency decision-making. Under the APA, a "reviewing court shall … hold unlawful and set aside" agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. "[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1023 (9th Cir. 2011) (*quoting Motor Vehicle Mfs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## VI.     FACTUAL AND PROCEDURAL BACKGROUND

**Naval Air Station Whidbey Island Complex**

34.     The Navy operates the Naval Air Station Whidbey Island Complex on Whidbey Island.

35.     Whidbey Island is a 40-mile long irregularly shaped island located in northern Puget Sound. The island has natural prairies, high bluffs, rugged beaches, protected coves, farmlands, and forests. Whidbey Island encompasses a number of popular state parks, including Deception Pass State Park, Dugualla State Park, Joseph Whidbey State Park, Fort Ebey State Park, Fort Casey Historical State Park, Possession Point State Park, and South Whidbey State Park. Whidbey Island and the surrounding area provide important habitat to a variety of protected species, including marbled murrelets, tufted puffins, and harbor seals.

36.     The Naval Air Station Whidbey Island Complex is the sole naval aviation support in the Pacific Northwest and includes four separate sites: the main air station at Ault Field; Outlying Landing Field (OLF) Coupeville; the Seaplane Base; and Lake Hancock.

37.     The challenged action mainly concerns training activities occurring at Ault Field and OLF Coupeville. Both Ault Field and OLF Coupeville began operating during World

STATE OF WASHINGTON'S
COMPLAINT

10

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

War II. Ault Field is located on the north-central part of the island near Coupeville Oak Harbor and OLF Coupeville is located approximately ten miles south, near the town of Coupeville. A significant portion of OLF Coupeville lies within the boundary of the Ebey's Landing National Historical Reserve. Both airfields may be used by military aircraft at any time, day or night.

38.     The Navy has designated Ault Field as the home base location for its tactical electronic attack community, which includes all EA-18G Growler squadrons. According to the Navy, the Growler's mission is to suppress enemy air defenses and communications systems and disrupt land-based threats to U.S. ground forces. Growlers are the loudest aircraft currently operating at the Whidbey Island Complex.

39.     In 2005, the Navy conducted an Environmental Assessment to review replacing EA-6B Prowler aircrafts with EA-18G Growler Aircrafts. At that time, the Navy anticipated operating 57 EA-18G Growlers at the Whidbey Island Complex; over time, that number grew to 82 Growlers. With the addition of 36 EA-18G Growlers in this challenged action, the Whidbey Island Complex will now support 118 Growlers.

**The Navy's NEPA Process and Record of Decision**

40.     On March 12, 2019, Phyllis L. Bayer, former Assistant Secretary of the Navy, issued a Record of Decision implementing Alternative 2A from the Navy's Final Environmental Impact Statement for EA-18G "Growler" Airfield Operations at Naval Air Station Whidbey Island Complex. Alternative 2A will add 36 EA-18G Growler aircrafts to Naval Air Station Whidbey Island, station 628 additional personnel and their family members at the Whidbey Island Complex, increase airfield operations at both Ault Field and Outlying Landing Field (OLF) Coupeville, and change the distribution of field carrier landing practices (FLCPs) to 20 percent occurring at Ault Field and 80 percent occurring at OLF Coupeville.

41.     Before issuing the Record of Decision, the Navy published a Draft EIS on November 10, 2016, Environmental Impact Statements; Notice of Availability, 81 Fed. Reg. 79,019 (Nov. 16, 2016), and a Final EIS issued on September 28, 2018, Environmental Impact

STATE OF WASHINGTON'S
COMPLAINT

11

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

Statements; Notice of Availability, 83 Fed. Reg. 49,089 (Sept. 28, 2018). The Navy received more than 4,000 public comments on the Draft EIS, including comments from the Washington Department of Fish and Wildlife and the Washington Department of Health. The Navy also received comments on its Final EIS, including a comment from Washington Governor, Jay Inslee, expressing concerns about adverse impacts to the local education system, housing, historic structures, and residents' health and quality of life.

**Public Health Impacts**

42.     The Navy's increase in Growler operations will result in both an increase in the number of people exposed to noise and an in increase the level of noise to which individuals are exposed. Growler operations generate noticeable low-frequency noise compared to other aircraft types, including the EA-6B Prowler, which the Growler replaced.

43.     This increased noise exposure will impact residential areas, state parks, and public schools. Under the selected alternative, more than 12,000 people in the action area will be exposed to noise levels at or above 65 decibel day-night average with more than 5,000 people exposed to noise levels at or above 75 decibel day-night average in a typical training year. Increased noise exposure will occur at Coupeville Elementary School, Crescent Harbor Elementary School, Deception Pass State Park, Ebey's Landing National Historical Reserve, Fort Casey Historical State Park, Fort Ebey State Park, San Juan Islands National Monument, and Cama Beach State Park, among other locations.

44.     In response to the Draft EIS, the Washington State Department of Health submitted a report to the Navy concluding that "noise levels similar to those reported from NAS Whidbey Island Complex described in all recent reports pose a threat to public health." Letter from Clark Halvorson, Assistant Secretary, Washington State Department of Health, Division of Environmental Public Health to Naval Facilities Engineering Command Atlantic re: Comments on the Environmental Impact Statement for EA-18G Growler Airfield Operations at Naval Air Station Whidbey Island, at 14 (Feb. 24, 2017) (emphasis added).

STATE OF WASHINGTON'S
COMPLAINT                                    12                    ATTORNEY GENERAL OF WASHINGTON
                                                                   Counsel for Environmental Protection
                                                                   800 Fifth Avenue STE 2000
                                                                   Seattle, WA 98104
                                                                   (206) 464-7744

1   While noting the need for additional research to better understand these public health threats

2   and the likely nuances associated with noise exposure specific to military aircraft, the

3   Department of Health concluded that existing literature provides evidence that noise exposure

4   can cause annoyance that adversely impacts mental and cardiovascular health, contribute to

5   sleep disturbance, and impair children's cognitive skills, particularly reading skills. *Id.* at 13–

6   14. Certain groups are potentially more susceptible to the effects of noise, including children,

7   the elderly, shift-works, smokers, and individuals with sleep disorders, mental disorders, and

8   physical illnesses. *Id.*

9          45.     The Navy's EIS does not adequately assess the nonauditory health impacts from

10   its increased Growler operations. Nonauditory health effects are physiological effects on health

11   and well-being caused by aircraft noise, including annoyance, cardiovascular health, mental

12   health, cognitive impairment, and mortality—in other words, health impacts other than those

13   on hearing. The Record of Decision concludes that "the data and research are inconclusive

14   with respect to the linkage between potential nonauditory health effects of aircraft noise

15   exposure." Dep't of the Navy, Record of Decision for the Final Environmental Impact

16   Statement (EIS) for EA-18G "Growler" Airfield Operations at Naval Air Station Whidbey

17   Island Complex, Island County, Washington, at 11 (Mar. 12, 2019) [hereinafter Record of

18   Decision]. To support this conclusion, the Navy applies an unreasonably high standard for

19   determining whether increased noise exposure from its Growler operations will have

20   nonauditory health impacts. Specifically, the Navy relies on the absence of a significant

21   "causal link between aircraft noise … and … nonauditory health effects" to dismiss threats to

22   public health. Record of Decision, 11; *see also* Final Environmental Impact Statement for EA-

23   18G "Growler" Airfield Operations at Naval Air Station Whidbey Island Complex, Island

24   County, Washington, at 3-23 [hereinafter Final EIS or EIS] ("No studies have shown a

25   definitive causal and significant relationship between aircraft noise and health.").

26

STATE OF WASHINGTON'S
COMPLAINT

13

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

46.     As the Washington Department of Health noted in comments on the Draft EIS, requiring a definitive causal relationship between aircraft noise and health impacts is an unreasonably high standard that results in nonauditory health effects being excluded from analysis. By relying on this unreasonable standard, the Navy arbitrarily dismisses evidence of nonauditory health impacts caused by noise exposure and ignored or undervalued a growing body of science indicating key health concerns from noise impacts, including impacts from aircraft noise.

47.     In comments on the Draft EIS, both the Washington Department of Health and the U.S. Environmental Protection Agency (EPA) raised concerns about the adequacy of the Navy's analysis of noise impacts and encouraged the Navy to consider additional information. Although the Navy expanded its review of the literature in response to these concerns, the Navy did not add the majority of studies recommended by the Department of Health to its analysis of health impacts in the EIS. In addition, the Navy's review did not alter the Navy's original conclusion that nonauditory impacts from increased noise were not a concern because a "definitive connection" between aircraft noise and nonauditory health effects did not exist. In maintaining this conclusion, the Navy arbitrarily dismisses a body of evidence indicating that environmental noise, including aircraft noise, has nonauditory health impacts on adults and children.

48.     To the extent the Navy concluded that the science on nonauditory health impacts from military aircraft noise is incomplete or unavailable, the Navy fails to meet its obligation under 40 C.F.R. § 1502.22, which requires agencies to either include information if the cost of obtaining it is not exorbitant or if the cost is exorbitant or the means to obtain it are not known to provide certain information and analysis in the EIS.

49.     The Navy also fails to analyze adequately the cognitive and learning impacts to children related to the Navy's increased Growler operations. Cognitive impairment typically is measured as the ability to perform a task that is assessed with neurobehavioral tests, written

STATE OF WASHINGTON'S
COMPLAINT

14

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

questionnaires, or interviews. As the Department of Health noted in its comments, recent research indicates an increasing trend associating noise exposure in children and impaired reading skills and memory. Although the Navy's analysis acknowledges that several studies suggest aircraft noise impacts academic performance of children, the Navy does not anticipate any significant disproportionate health impacts to children from aircraft noise due to limited scientific literature and the intermittent nature of aircraft noise. The Navy's conclusion is not rational or supported by the scientific evidence in the record. For example, the Navy does not explain how its conclusion squares with science demonstrating how aircraft noise impacts student academic performance, or consider the potential impacts to academic performance of a significant increase in Growler operations.

50.     In addition, because the EIS does not properly analyze the potential public health and cognitive and learning impacts from the Navy's EA-18G Growler expansion program, the EIS also fails to sufficiently identify and assess mitigation measures to address these impacts.

**Wildlife Impacts**

51.     NEPA requires a detailed review of the environmental impacts of a proposed action, including impacts to wildlife in the study area of the proposed action.

52.     Approximately 230 migratory bird species occur annually within the study area defined by the EIS. Some of these species remain in the study area year round, while others occur seasonally during spring or fall migrations, the breeding season, or winter. About 120 species breed annually on Whidbey Island, including rufous hummingbirds, barn swallows, and black-headed grosbeaks. In addition more than 120 migratory bird species overwinter within the study area, including buffleheads, horned grebes, ruby-crowned kinglets, and golden-crowned sparrows. Common year round residents include mallards, great blue herons, bald eagles, northern flickers, and song sparrows.

STATE OF WASHINGTON'S
COMPLAINT

15

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

53.     Washington has designated several bird species in the action area as priority species, including the common murre, marbled murrelet, tufted puffin, great blue heron, harlequin ducks, and peregrine falcons. Tufted puffins are listed as endangered under Washington state law and breed on Smith Island, a small island west of Whidbey Island within the action area, and have been seen in the waters of south Lopez Island. Marbled murrelets are federally listed as threatened and state listed as endangered. The proposed action area for the Navy's Growler expansion provides foraging habitat essential to marbled murrelet survival and recovery. The action area also includes habitat for bald eagles and golden eagles.

54.     The action area for the Navy's expanded Growler operations encompasses important bird habitat including portions of the San Juan Islands National Wildlife Refuge, the Deception Pass Important Bird Area, the Crescent Harbor Marshes Important Bird Area, the Penn Cove Important Bird Area, the Crockett Lake Important Bird Area, the Skagit Bay Important Bird Area, and a small part of the Samish/Padilla Bays Important Bird Area. The Skagit Bay and Penn Cover Important Bird Areas were designated, in part, due to their importance for breeding bald eagles.

55.     The action area provides habitat for a variety of other wildlife, including harbor seals, endangered Southern Resident Killer Whales, Steller sea lions, and western toads.

56.     The Navy's EIS fails to take a hard look at the impacts on birds and other wildlife in the action area of increased noise disturbance from its Growler operations.

57.     Despite stating that different bird species and mammals react differently to noise disturbances, the Navy's analysis does not meaningfully consider species-specific impacts from the Navy's Growler operations. The EIS recognizes that "[b]ird responses to anthropogenic disturbances, including aircraft noise, vary by species, and may vary by situation." Final EIS 4-337. Yet, instead of analyzing how different bird species in the action area may respond to the Navy's Growler operations, the EIS engages in a general discussion of bird impacts to reach its overall conclusion that birds will not be significantly impacted by

STATE OF WASHINGTON'S
COMPLAINT

16

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

Growler operations. Notably, the Navy fails entirely to address impacts to tufted puffins, which Washington lists as a state endangered species and, as WDFW pointed out in its comments on the Draft EIS, breeds within the action area. In addition, despite receiving comments from WDFW emphasizing "that individual shorebird species will react differently [to anthropogenic disturbances] and therefore must be considered on a species by species basis," Marczin et al., Comments of the Washington Department of Fish and Wildlife on the Draft Environmental Impact Statement or the EA-18G "Growler" Airfield Operations at NAS Whidbey Island Complex, at 3–4 (Feb. 21, 2017), the EIS fails to conduct species-specific evaluation for a variety of shorebirds, including for Red knots, solitary sandpipers, and black oystercatchers, all of which are shorebirds of conservation concern occurring within the study area. The EIS further fails to consider research related to noise impacts on harbor seals and other pinnipeds, which WDFW also identified in its comments.

58.    In responding to comments on the Draft EIS, the Navy explained that it updated its analysis in the Final EIS with scientific literature for additional species but stated that it continued to "present[] its impact conclusions for the species group as a whole, and not for individual species, with the exception of federally protected species." Appx. M-57.

59.    The Navy's general discussion of impacts to wildlife fails to take a hard look at the environmental impacts of the Proposed Action.

60.    In addition, the Navy fails to take a hard look at bird impacts by unreasonably concluding that increased Growler operations will not significantly impact bird species. The Navy supports this conclusion with three main points: (1) some birds in the action area have habituated to the current level of aircraft operations; (2) those that have not habituated or are new to the area may respond to aircraft activities by exhibiting alert postures, flushing or diving, but will resume normal activities "within a short period after overflights" and thus their "critical behaviors," such as feeding and resting, will not be affected; and (3) the Navy's

STATE OF WASHINGTON'S
COMPLAINT                                    17                    ATTORNEY GENERAL OF WASHINGTON
                                                                   Counsel for Environmental Protection
                                                                   800 Fifth Avenue STE 2000
                                                                   Seattle, WA 98104
                                                                   (206) 464-7744

1   aircraft operations will present "minimal short-term impacts on birds." Final EIS 4-342. The

2   Navy's analysis in the EIS does not support these conclusions.

3          60.1    First, the Navy's reliance on habituation to <u>current</u> levels of aircraft

4   operations fails to consider that species may react differently to future increased Growler

5   operations. That these birds may have tolerated past Navy operations by remaining in the

6   action area does not necessarily support tolerance of a 33 percent increase in air traffic.

7          60.2    Second, the Navy's narrow focus on short-term impacts to critical

8   behaviors fails to consider long-term impacts to species health. Specifically, the Navy fails to

9   consider the physiological stress or energetic costs caused by the disturbance, does not account

10  for potentially more harmful impacts to bird health during breeding season or other sensitive

11  times of the year, and contradicts science demonstrating that aircraft operations may have long-

12  term impacts on fitness, including the ability to survive to reproductive age, find a mate, and

13  produce offspring, outside of short-term impacts to critical behaviors.

14         60.3    Third, the Navy irrationally concludes that Growler aircraft operations

15  will result in minimal, short-term impacts on birds. Although the nature of the Navy's flights

16  may be intermittent, the Navy plans to operate over 112,000 flights annually, including 97,500

17  Growler flights. The Navy attempts to minimize these impacts by calculating the number of

18  hours that birds in the study area would be exposed to Growler events greater than or equal to

19  92 decibels. But this simplistic analysis ignores that each flight or pattern operation has the

20  potential to impact birds, regardless of the duration of the event. In addition, the Navy's

21  reliance on data documenting Growler exposure at 92 decibels or above contradicts the Navy's

22  admission that birds begin to respond to aircraft noise at as little as 60 decibels.

23         61.    The Navy engages in a similarly flawed approach in analyzing impacts to

24  federally protected marbled murrelets and bald eagles. As with other birds, the Navy

25  unreasonably relies on habituation to existing levels of aircraft activity to dismiss impacts from

26  the Navy's increased Growler operations. Notably, while the Navy notes that sensory

STATE OF WASHINGTON'S
COMPLAINT

18

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

disturbance from aircrafts may affect marbled murrelets, the Navy fails to address the energetic consequences of responses to Growlers, including impacts to adult marbled murrelet survival and reproduction and indirect impacts to nestling murrelets, including impacts to growth, development and survival of chicks that were identified by the U.S. Fish and Wildlife Service (FWS) in its Biological Opinion assessing marbled murrelet impacts from the Navy's increased Growler operations.

62.     The Navy similarly dismisses impacts to bald eagles by relying on the habituation of breeding bald eagles to aircraft noise and the small annual increases in hours of aircraft noise. Final EIS 4-345. As with other birds, the Navy's conclusion unreasonably conflates the presence of bald eagles with an absence of adverse impacts from noise disturbance, ignores the Navy's own analysis demonstrating that bald eagles respond to military jets during breeding seasons, and irrationally considers impact based on annual hours of noise as opposed to instances of noise disruption from increased Growler flight operations.

63.     The EIS further fails to take a hard look at environmental impacts to other wildlife, including terrestrial mammals, marine mammals, and reptiles and amphibians, by relying on the same flawed conclusions the Navy used for bird species. As with birds, the Navy unreasonably concludes that impacts will not be significant because some species have habituated to current levels of disturbance, that those species that do react will quickly resume normal activities without considering longer-term fitness costs associated with the response, and that the impact from the approximate 33 percent increase in aircraft operations will be minimal by focusing on annual hours of Growler activity as opposed to the number of disruptive noise events that will occur. The Navy's analysis fails to meet its obligations under NEPA to carefully consider the environmental impacts of its proposed action.

64.     In addition, the EIS fails to sufficiently identify and assess mitigation measures to reduce impacts on wildlife as required by NEPA. Although Appendix H to the EIS contains a discussion of mitigation measures, none of the mitigation measures discussed focus on

STATE OF WASHINGTON'S
COMPLAINT
19
ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

reducing impacts to wildlife. As a result, Defendants fail to meet their obligations under NEPA to consider mitigation measures.

**The Navy's NHPA Process**

65.     Section 106 of the National Historic Preservation Act requires federal agencies to consider the impact of proposed actions on historic resources.

66.     Although the Navy initiated its Section 106 review process in autumn 2014 by contacting consulting parties, including the Washington State Historic Preservation Office (SHPO), the Navy did not release its Determination of Adverse Effect until June 2018. The Determination of Adverse Effect concluded that the increased frequency of noise exposure will adversely and indirectly affect characteristics of the Central Whidbey Island Historic District that make it eligible for inclusion in the National Register of Historic places.

67.     The Central Whidbey Island Historic District was deemed eligible for listing in the National Register of Historic Places in 1973 due in large part to one of the largest intact collections of nineteenth century residential and commercial structures in rural Washington. In 1978, Congress created Ebey's Landing National Historic Reserve, which incorporates the Central Whidbey Island Historic District, to preserve and protect "a rural community which provides an unbroken historical record from nineteenth century exploration and settlement in Puget Sound to present time" and to commemorate exploration and settlement of Whidbey Island. Pub. L. 95-625 § 508(a). Together, the Reserve and District celebrate rich and assorted natural and cultural resources that have great significance to Pacific Northwest and national history. The area's views and perceptive qualities, including the soundscape, contribute to the landscape's authenticity as a cohesive historical and cultural landscape.

68.     The Determination of Adverse Effect stated that the Navy's Growler operations would adversely affect the perceptual qualities of certain areas within the Central Whidbey Island Historic District that contribute to the significance of the landscape. At that time, the Navy proposed to mitigate these effects by installing interpretive signs at affected locations,

STATE OF WASHINGTON'S
COMPLAINT

20

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

supporting partnership opportunities with the federal Readiness and Environmental Protection

Integration (REPI) program, and supporting online inventory of historic properties at Ebey's

Reserve.

69.     The Determination of Adverse Effect triggered the Navy's obligation to consult

with the SHPO, other consulting parties, and the public to develop alternatives or

modifications to the Navy's proposed action that could avoid, minimize, or mitigate the

adverse effects. 36 C.F.R. § 800.6.

70.     Although the SPHO concurred in the Navy's June 2018 Determination of

Adverse Effect, it consistently expressed concern that the Navy's proposed mitigation

measures were inadequate to address adverse effects on impacted historic resources. The

Ebey's Landing Historical Reserve Trust Board, among other consulting parties, also

expressed concern about the adequacy of the Navy's proposed mitigation measures to address

the impacts from the Navy's increased Growler operations.

71.     After a series of meetings and communications with consulting parties about

appropriate measures to mitigate the harm to historic resources from the Navy's increased

Growler operations, the Navy terminated consultation on November 30, 2018. In terminating

consultation, the Navy stated further consultation was no longer productive due to

disagreement on the type and amount of mitigation appropriate to resolve adverse effects to

historic properties and the Navy's operational requirements that dictated a need to make a

decision on the undertaking. The Navy terminated consultation just four months after the Navy

provided its finding of adverse effect to the consulting parties. At the time the Navy terminated

consultation, its proposed mitigation measures included providing up to $1 million funding to

the National Park Service (NPS) to support preservation projects at Ferry House, an NPS-

owned historic structure at Admiralty Inlet; providing $75,000 to the NPS to install interpretive

signs with historic information at affected locations; and supporting partnership opportunities

with the federal REPI program and the federal Sentinel Landscape program.

STATE OF WASHINGTON'S
COMPLAINT

21

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

72.     After terminating consultation, the Navy sought comments from the federal
Advisory Council on Historic Preservation as required by Section 106 regulations. The Council
issued comments on February 19, 2019, recommending, among other things, that the Navy
mitigate adverse effects by: (1) working with stakeholders to monitor noise impacts associated
with expanded Growler operations to have a fuller understanding of effects and measures to
address them; (2) committing to working with stakeholders to develop mitigation measures
based on the results of the recommended monitoring; and (3) working with stakeholders to
identify potential changes to operational procedures to reduce noise. The ACHP comments
specifically recommended that the Navy consider a broader range of funding to support
measures to advance the long-term preservation of the historic characteristics of the Central
Whidbey Island Historic Reserve beyond the previously proposed funding for the National
Park Service to rehabilitate the Ferry House. The Council's comments further noted that the
discussion with consulting parties regarding alternatives to avoid, minimize, or mitigate
adverse effects of the Navy's Growler operations was severely limited by the Navy's timeline
for concluding its NEPA process.

73.     Less than three weeks later, the Navy's Section 106 decision declined to adopt
the ACHP's recommendation for additional noise monitoring efforts, declined to engage in
further discussions with stakeholders to identify mitigation measures, and declined to examine
other creative means of funding and carrying out mitigation measures. Instead, the Navy
adopted similar, but lessened mitigation measures to those it proposed before terminating
consultation: providing $867,000 funding to the NPS to support Ferry House preservation
projects; providing up to $20,000 to the NPS for interpretive historical signs at affected
locations; and supporting partnership opportunities with the federal REPI program and the
federal Sentinel Landscape program.

74.     On March 8, 2019, Secretary of the Navy Richard V. Spencer issued the Navy's
decision under Section 106 of the NHPA to move forward with the proposed undertaking of

STATE OF WASHINGTON'S
COMPLAINT                                              22                    ATTORNEY GENERAL OF WASHINGTON
                                                                                    Counsel for Environmental Protection
                                                                                    800 Fifth Avenue STE 2000
                                                                                    Seattle, WA 98104
                                                                                    (206) 464-7744

expanding EA-18G Growler operations at the Whidbey Island Complex. Secretary Spencer's Section 106 decision noted the Navy's determination that increased Growler operations would result in adverse indirect effects to the Central Whidbey Island Historic District by affecting perceptual qualities of certain locations that contribute to the significance of the Historic District landscape.

75.     The Navy's Section 106 decision does not provide a rational explanation for its final decision on the undertaking, including the Navy's adoption of mitigation measures and the Navy's consideration of the Council's comments. The mitigation measures adopted in the Section 106 decision and the Record of Decision are arbitrary and capricious because they do not represent a reasonable and good faith effort to address the adverse impacts to the Central Whidbey Island Historic District and Ebey's Landing Historical Reserve caused by the Navy's expanded EA-18G Growler operations.

## VII.   FIRST CAUSE OF ACTION
### (Violation of NEPA and the APA:
### Failure to Take a Hard Look at Public Health Impacts)

76.     Plaintiff repeats and incorporates by reference the allegations contains in paragraphs 1 through 75 above.

77.     NEPA requires that federal agencies take a "hard look" at the significant impacts on the human environment of any proposed major federal action. *See,* 42 U.S.C. § 4332; *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998). "The hallmarks of a 'hard look' are thorough investigation into environmental impacts and forthright acknowledgement of the potential environmental harms." *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 187 (4th Cir. 2005) (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)).

78.     NEPA and its implementing regulations require Defendants to prepare a detailed environmental impact statement that assesses the environmental impacts of the

STATE OF WASHINGTON'S
COMPLAINT

23

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

1  proposed action, including direct and reasonably foreseeable indirect environmental impacts.

2  42 U.S.C § 4332(C); 40 C.F.R. §§ 1502.16, 1508.8. Impacts of a proposed action include

3  ecological, aesthetic, historic, cultural, economic, social, and health impacts. *Id.* § 1508.8(b).

4  An agency must ensure the "professional integrity, including scientific integrity, of the

5  discussions and analyses in environmental impact statements" and must rely on "high quality"

6  and "accurate scientific analysis." 40 C.F.R. §§ 1500.1; 1502.24. In addition, an agency "shall

7  identify any methodologies used and shall make explicit reference by footnote to the scientific

8  and other resource relied upon for conclusions in the statement." *Id.* § 1502.24. An EIS "shall

9  provide a full and fair discussion of significant environmental impacts" and "shall be supported

10  by evidence that the agency has made the necessary environmental analyses." 50 C.F.R.

11  § 1502.1.

12      79.   In evaluating reasonably foreseeable significant adverse effects on the human

13  environment, an agency must disclose any incomplete or unavailable information. 40 C.F.R.

14  § 1502.22. If the incomplete information is essential to a reasoned choice among alternatives,

15  the EIS must include the information in the EIS if the cost of obtaining the information is not

16  exorbitant. *Id.* § 1502.22(a). However, if such information cannot be obtained, the EIS should

17  include: "(1) a statement that such information is incomplete or unavailable; (2) a statement of

18  the relevance of such information to evaluating the reasonably foreseeable significant adverse

19  impacts on the human environment; (3) a summary of existing credible scientific evidence

20  which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the

21  human environment; and (4) the agency's evaluation of such impacts based upon theoretical

22  approaches or research methods generally accepted in the scientific community." *Id.*

23  § 1502.22(b).

24      80.   In violation of these mandates, Defendants' EIS relies on an inadequate and

25  irrational analysis of the public health impacts related to the Navy's expansion of its EA-18G

26  Growler operations at the Whidbey Island Complex. The available information, including

STATE OF WASHINGTON'S
COMPLAINT

24

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

information provided by state and federal agencies and the public, detail the potential threats to public health, including non-auditory health and cognitive impacts, from increased noise disturbance caused by the Navy's EA-18G Growler operations. As the Washington Department of Health stated, the noise levels generated by EA-18G Growler operations pose a threat to public health. The EIS, however, fails to analyze adequately and rationally these impacts to nonauditory health and cognitive ability and further fails to provide a sufficient explanation regarding any incomplete or unavailable information.

81.     The EIS does not contain sufficient information or adequate analysis of the environmental impacts of the proposed action to foster informed decision-making or informed public participation. For these reasons, the EIS and the Record of Decision which relies on the EIS are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law and without observance of procedure required by law in violation of NEPA, 42 U.S.C. § 4332, and its implementing regulations, and the APA, 5 U.S.C. §§ 701–706.

### VIII.   SECOND CAUSE OF ACTION
#### (Violation of NEPA and the APA:
#### Failure to Take a Hard Look at Wildlife Impacts)

82.     Plaintiff repeats and incorporates by reference the allegations contains in paragraphs 1 through 81 above.

83.     NEPA requires that federal agencies take a "hard look" at the significant impacts on the human environment of any proposed major federal action. *See* 42 U.S.C. § 4332; *Blue Mountains Biodiversity Project*, 161 F.3d at 1211. "The hallmarks of a 'hard look' are thorough investigation into environmental impacts and forthright acknowledgement of the potential environmental harms." *Nat'l Audubon Soc'y*, 422 F.3d at 187 (citing *Robertson*, 490 U.S. at 350.

84.     NEPA and its implementing regulations require Defendants to prepare a detailed environmental impact statement that assesses the environmental impacts of the

STATE OF WASHINGTON'S
COMPLAINT

25

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

proposed action, including direct and reasonably foreseeable indirect environmental impacts. 42 U.S.C § 4332(C); 40 C.F.R. §§ 1502.16, 1508.8. Impacts of a proposed action include ecological, aesthetic, historic, cultural, economic, social, and health impacts. *Id.* § 1508.8(b). An agency must ensure the "professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements" and must rely on "high quality" and "accurate scientific analysis." 40 C.F.R. §§ 1500.1; 1502.24. In addition, an agency "shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other resource relied upon for conclusions in the statement." *Id.* § 1502.24. An EIS "shall provide a full and fair discussion of significant environmental impacts" and "shall be supported by evidence that the agency has made the necessary environmental analyses." 40 C.F.R. § 1502.1.

85.     In violation of these mandates, Defendants' EIS relies on an inadequate and irrational analysis of the wildlife impacts related to the Navy's expansion of its EA-18G Growler operations at the Whidbey Island Complex. The Navy's cursory analysis of impacts to wildlife violates NEPA. *See Nat'l Audubon Soc'y*, 422 F.3d at 192–94. The Navy improperly dismisses impacts to wildlife by failing to consider available information and reaching conclusions not supported by the record.

86.     The EIS does not contain sufficient information or adequate analysis of the environmental impacts of the proposed action to foster informed decision-making or informed public participation. For these reasons, the EIS and the Record of Decision which relies on the EIS are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law and without observance of procedure required by law in violation of NEPA, 42 U.S.C. § 4332, and its implementing regulations, and the APA, 5 U.S.C. §§ 701–706.

STATE OF WASHINGTON'S
COMPLAINT

26

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

# IX.    THIRD CAUSE OF ACTION
## (Violation of NEPA and the APA:
### Failure to Consider Appropriate Mitigation Measures)

87.     Plaintiff repeats and incorporates by reference the allegations contains in paragraphs 1 through 86 above.

88.     "Implicit in NEPA's demand that an agency prepare a detailed statement on 'any adverse environmental effects which cannot be avoided should the proposal be implemented,' is an understanding that the EIS will discuss the extent to which adverse effects can be avoided." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351–52 (1989) (quoting 42 U.S.C. § 4332(C)(ii)). Accordingly, NEPA's implementing regulations require that an agency address "appropriate mitigation measures not already included in the proposed action or alternative." 40 C.F.R. §§ 1502.14(f); *see also* 1502.16(h).

89.     The EIS fails to adhere to this mandate by not considering reasonable mitigation measures related to wildlife, public health, or historic impacts. For this reason, the EIS and the Record of Decision which relies on the EIS are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law and without observance of procedure required by law in violation of NEPA, 42 U.S.C. § 4332, and its implementing regulations, and the APA, 5 U.S.C. §§ 701–706.

# X.    FOURTH CAUSE OF ACTION
## (Violation of the APA and NHPA: Adoption of Arbitrary and Capricious Measures to Avoid or Mitigate Adverse Effects)

90.     Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 89.

91.     "Under NHPA, a federal agency must make a reasonable and good faith effort to … assess the effects of the undertaking on any eligible historic properties found, … determine whether the effect will be adverse, … and avoid or mitigate any adverse effects, …." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999) (citations

STATE OF WASHINGTON'S
COMPLAINT

27

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

omitted). Where a federal agency terminates consultation, the agency's final decision on the undertaking must summarize its decision, provide rationale for the decision, and demonstrate that the agency took into account the Council's comments in reaching a final decision. 36 C.F.R. § 800.7(a)(4). Under the APA, a final agency decision may be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

92.     The Navy's Section 106 decision violates these mandates. Although Navy concluded that its expanded EA-18G Growler program would have adverse effects on the characteristics of the Central Island Historic District that make it eligible for the National Register of Historic Places, the Navy violated NHPA's mandate by failing to make a reasonable and good faith effort to avoid or mitigate these adverse effects. Instead, the Navy adopted arbitrary and capricious mitigation measures that do not meaningfully address the adverse effects on historic resources in the Central Whidbey Island Historic District and the Ebey's Landing Historic Reserve that will be caused by the Navy's expanded EA-18G Growler operations. In addition, the Navy's Section 106 decision does not provide a rational explanation for its final decision on the undertaking, including the Navy's adoption of mitigation measures and the Navy's consideration of the Council's comments.

93.     For this reason, the Section 106 Determination and the Record of Decision which relies on the Section 106 Determination are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law and without observance of procedure required by law in violation of the NHPA, 54 U.S.C. § 306108, and its implementing regulations, and the APA, 5 U.S.C. §§ 701–706.

STATE OF WASHINGTON'S
COMPLAINT

28

ATTORNEY GENERAL OF WASHINGTON
Counsel for Environmental Protection
800 Fifth Avenue STE 2000
Seattle, WA 98104
(206) 464-7744

1

## XI.    RELIEF REQUESTED

2      WHEREFORE, the State respectfully requests that this Court:

3      A.    Enter a declaratory judgment that Defendants have violated and are violating the

4 National Environmental Policy Act and the Administrative Procedure Act by adopting and

5 relying on a legally deficient EIS to issue the challenged Record of Decision.

6      B.    Enter a declaratory judgment that Defendants have violated and are violating the

7 National Historic Preservation Act and the Administrative Procedure Act by relying on a legally

8 deficient Section 106 decision to issue the challenged Record of Decision.

9      C.    Vacate and set aside Defendants' Record of Decision.

10     D.    Vacate and set aside Defendants' Section 106 decision.

11     E.    Issue any appropriate injunctive relief.

12     F.    Award Plaintiff State of Washington, the costs of this action, including

13 reasonable attorneys' fees and litigation expenses.

14     G.    Grant Plaintiff State of Washington such further relief as the Court may deem just

15 and proper.

16     DATED this 9th day of July, 2019.

17
                                          ROBERT W. FERGUSON
                                          Attorney General of Washington
18
                                          s/ *William Sherman*
19                                        William Sherman, WSBA #29365
                                          Assistant Attorney General
20                                        Aurora Janke, WSBA #45862
                                          Special Assistant Attorney General
21                                        Washington Attorney General's Office
                                          Counsel for Environmental Protection
22                                        800 5th Ave Ste. 2000 TB-14
                                          Seattle, Washington 98104-3188
23                                        (206) 233-3391
                                          Bill.Sherman@atg.wa.gov
24                                        Aurora.Janke@atg.wa.gov

25

26