1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8
9

10

STATE OF WASHINGTON, *et al.*,

11

Plaintiffs,

CASE NO. 2:19-cv-01059-RAJ-JRC

12

v.

REPORT AND
RECOMMENDATION

13

UNITED STATES DEPARTMENT OF
THE NAVY, *et al.*,

14

NOTED: August 7, 2020

Defendants.

15
16

    This matter has been referred to the undersigned by the District Court, as authorized by

17

28 U.S.C. § 636(b).  *See* Dkt. 19.

18

    The United States Navy operates the Whidbey Island Naval Air Station and has two

19

airfields on Whidbey Island:  OLF Coupeville and Ault Field.  *See* GRR 150141.[1]  Ault Field is

20

the main air station, located next to the city of Oak Harbor, and OLF Coupeville is the smaller,

21

secondary station, principally used for simulating aircraft carrier take-offs and landings.  *See*

22
23

---

[1] The combined administrative record is cited as "GRR" and is on file with the Court.  *See* Dkt. 49.

24

GRR 150141.  In 2019, following an administrative review process, the Department of the Navy expanded its operations by adding 36 Growler aircraft to the NAS Whidbey Island Complex and allocating 80% of all carrier practice to OLF Coupeville.  *See* GRR 167646.  The Navy estimated that this would represent an increase from 90 to 360 hours of annual aircraft activity over Coupeville.  GRR 167647.

In this consolidated matter, plaintiffs Citizens of the Ebey's Reserve for a Healthy, Safe, and Peaceful Environment ("COER") and Paula Spina—homeowners living near OLF Coupeville airfield—together with the State of Washington challenge the Department of the Navy's decision to increase Growler flights.  They challenge the validity of the Navy's Environmental Impact Statement ("EIS") that the Navy relied on in the Record of Decision ("ROD") increasing operations.

Plaintiff COER brings the pending motion for preliminary injunction to halt the Navy's increased Growler flight operations at OLF Coupeville during the pendency of this litigation, arguing that it has established a likelihood of success on the merits of its claims under the National Environmental Policy Act ("NEPA")[2] and the National Historic Preservation Act ("NHPA").[3]  COER asks the Court to immediately pause the increased level of operations at OLF Coupeville, returning them to pre-ROD levels and ordering the Navy to hold the trainings elsewhere.  Dkt. 29.

At least at the early stage of this litigation, plaintiffs have failed to demonstrate that they can overcome the deference to the Navy's judgments about national security that the Supreme Court has instructed courts to give the Department of Defense when considering military

---

[2] 42 U.S.C. §§ 4321–4370m-12.

[3] 54 U.S.C. § 306108.

1   operations.  *See Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 20 (2008).  In fact, plaintiffs have

2   not discussed any case, and the Court has not found any, where a court has granted a preliminary

3   injunction countermanding a Department of Defense decision concerning military operations

4   affecting the national security under similar circumstances and where that court's ruling was not

5   overturned.  *See* Dkts. 29, 59.  The Supreme Court has instructed courts that the public interest in

6   maintaining the national security weighs heavily in favor of denying the type of injunction

7   plaintiffs seek here.

8         The Court is also concerned about second guessing the Navy's judgments regarding

9   military operations at this early stage of the litigation where plaintiffs seek the extraordinary

10  remedy of a preliminary injunction—a remedy that would require day-to-day entanglement of

11  the Court in Navy operations.  Plaintiffs' assertion that Growler operations can be relocated

12  during this litigation is unpersuasive in light of the Navy's uncontested evidence that other

13  airfields are oversaturated, that unique conditions are required to make an airfield suitable for

14  carrier landing practice, and that operations are not readily transferable to Ault or other airfields.

15  At this point of the litigation, the court is not in a position to instruct the Navy regarding suitable

16  alternative landing sites.

17        Further, although plaintiffs have provided evidence of disruption in their daily lives

18  caused by increased noise impacts, this evidence falls short of establishing the type of imminent

19  irreparable harm not compensable through a damages award.  Plaintiffs filed their motion nearly

20  a year after the Navy authorized the increase in operations, yet plaintiffs have not come forward

21  with demonstrable evidence linking the increase in operations to any quantifiable health

22  problems associated with this level of increased Growler activity.  If, indeed, plaintiffs prevail

23  and prove damages, such as reduction in property values or loss of enjoyment of their property,

24

1    these are compensable in the form of money damages and not the type of irreparable injury that

2    justifies an injunction.  Therefore, the Court cannot conclude that irreparable harm will

3    imminently occur by continuing these same operations while this litigation is pending.

4        A preliminary injunction is an extraordinary remedy because it is ordered before the

5    merits of the case can be fully vetted by the court.  In light of the undisputed national security

6    interests impacted by this operation and the failure to demonstrate imminent irreparable harm

7    caused the ongoing operation, this Court recommends that plaintiff's motion for preliminary

8    injunction be denied.

9    **BACKGROUND**

10   **I. Overview of Procedural History**

11       Consolidated plaintiffs the State of Washington, COER, and Paula Spina bring NEPA

12   and NHPA claims against the U.S. Department of the Navy and various officials thereof, relying

13   on the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  *See* Dkt. 1, at 1–2; *see also* Dkt.

14   1, at 1–3, *COER et al. v. U.S. Dep't of the Navy et al.*, 2:19-cv-1062-RAJ-JRC.  They challenge

15   the March 2019 ROD increasing the Navy's EA-18G Growler aircraft operations at Naval Air

16   Station Whidbey Island.  *See* Dkt. 1, at 1–3, 2:19-cv-1062-RAJ-JRC.  In its complaint, COER

17   seeks to have the ROD set aside and to have the Court enjoin the increased Growler operations

18   and order defendants to provide a supplemental EIS.  *See* Dkt. 1, at 3, 34, 2:19-cv-1062-RAJ-

19   JRC.

20       The parties have filed a consolidated administrative record, which includes the September

21   2018 EIS at issue in this case.  *See* Dkt. 49; *see also* Dkt. 36; GRR 150135.  In addition, as

22   support for their motion for a preliminary injunction, plaintiffs provide declarations from

23   themselves, members of local governments, a nurse, an acoustic expert, and a retired air force

24

1    colonel.  *See* Dkts. 29–46, 62.  In response, the Navy relies on various officials' declarations,

2    including a classified document of which they sought—and the Court granted—*in camera*

3    review.  *See* Dkts. 53, 55, 67.  The matter is ripe for decision.

4    **II.  Brief Summary of Underlying Facts**

5         Since 1967, the Navy has used OLF Coupeville for field carrier landing practice

6    ("FCLP").  *See COER v. U.S. Dep't of the Navy* ("*COER I*"), 122 F. Supp. 3d 1068, 1073 (W.D.

7    Wash. 2015).  In January 2005, the Navy announced that it would transition from EA-6B

8    "Prowler" to Growler aircraft, having performed an environmental assessment that concluded

9    there would be no significant impact from the transition.  *COER I*, 122 F. Supp. 3d at 1073.  The

10   Navy began using Growler jets on Whidbey Island in 2008.  GRR 167642.

11        In June 2013, COER requested an EIS regarding the activities at OLF Coupeville.  *COER*

12   *I*, 122 F. Supp. 3d at 1075.  The Navy subsequently announced a Notice of Intent to prepare an

13   EIS for increased Growler operations.  *Id.* at 1076.  COER, which brought suit in this Court in

14   July 2013, moved for a preliminary injunction barring further flight operations until the Navy

15   had completed its EIS.  *See id.* at 1083.  The Court denied plaintiffs' motion, finding that the

16   ongoing activity was not significantly more severe than predicted in 2005.  *Id.* at 1072.

17        In 2014, the Navy requested—and ultimately received—funding to purchase additional

18   Growler aircraft.  GRR 167642–43.  The Navy published a draft EIS in November 2016 and

19   received comments from the public and interested parties.  *See* GRR 167643–44.  In June 2018,

20   the Navy announced the preferred alternative, and in September 2018, the Navy published the

21   final EIS.  *See* GRR 167644.

22        The final EIS proposed expanding Growler operations at the Whidbey Island Naval Air

23   Station ("NASWI"), including expanding FCLPs and increasing electronic attack capabilities by

24

1    adding 36 aircraft. GRR 150142. This alternative was preferred because it "best meets

2    operational demands by both establishing two new expeditionary squadrons and adding two

3    aircraft to each squadron that operates off aircraft carriers" and because it "results in the least

4    disruption of other operations at Ault Field, provides the best training for Navy pilots, and

5    impacts the fewest number of residents living in the community." GRR 150142.

6        Based on its findings, the Navy implemented a ROD in March 2019 that authorized the

7    preferred alternative. GRR 167646. The Navy found that the preferred alternative represented a

8    change from 1% to 4% in the increase in annual aircraft activity at OLF Coupeville. GRR

9    167646–47. Compared to other alternatives, it had the next-to-smallest increase in the number of

10    people exposed to annual noise levels of more than "65 A-weighted decibels . . . day-night

11    average sound level (DNL) or above," impacting only four more people than the environmentally

12    preferred alternative. *See* GRR 167647.

13        Plaintiffs dispute these findings. They assert that the EIS's rationale supporting the

14    preferred alternative was fundamentally flawed because the Navy used misleading metrics for

15    measuring noise impacts, should have incorporated real-world testing, failed to take into account

16    the effect of noisier, enhanced engines, and failed to adequately take into consideration

17    recommendations from the federal Advisory Council on Historic Preservation ("ACHP"). *See*

18    *generally* Dkt. 29. They further assert that preliminary injunctive relief is appropriate based on

19    declarations of COER members and others in nearby communities about the level of noise to

20    which they are subjected and the disruption to their daily lives caused by this noise, their expert's

21    noise measurements, and a former air squadron commander's declaration that contrary to the

22    Navy's arguments, other airfields are available substitutes for operations at OLF Coupeville. *See*

23    *generally* Dkts. 29, 59.

24

**DISCUSSION**

**I. Preliminary Injunction Principles**

A plaintiff seeking a preliminary injunction must establish (1) a likelihood of success on the merits, (2) a likelihood of suffering irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in the plaintiff's favor, and (4) that an injunction is in the public interest. *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 20 (2008). The balance of equities and public interests factors merge when the Government is a party. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

A plaintiff may also obtain a preliminary injunction by showing "serious questions going to the merits were raised" (a lesser standard than a likelihood of success) and that "the balance of hardships tips *sharply* in [plaintiff's] favor," if the other elements of the *Winter* test are met. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131, 1135 (2011) (internal quotation omitted and emphasis added). However, a preliminary injunction always requires more than a mere possibility of irreparable harm because a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* at 24 (internal citation omitted). In *Winter*, the Supreme Court cautioned against "understat[ing] the burden the preliminary injunction would impose on the Navy's ability to conduct realistic training exercises, and the injunction's consequent adverse impact on the public interest in national defense." *Id.* Reflecting the importance of this factor, the undersigned begins by addressing plaintiffs' arguments regarding the public interest.

## II. Public Interest and Balance of the Equities

Plaintiffs argue here that COER members—and the entire Central Whidbey island community—will suffer great hardship if the Navy's increased operations are not halted since they will continue to be subjected to Growler disturbances. *See* Dkt. 29, at 28. They rely on their own declarations about the level of noise impact on their lives. For instance, a resident states that she is trying to sell her home because of unbearable levels of noise that cause her and her young son to hide in a closet when Growlers are flying overhead. Dkt. 32, at 3. Another resident explains that Growler noise is so loud that "we are unable to carry on a conversation inside our own home, nor can we watch TV, listen to music, or even sit and read quietly." Dkt. 31, at 2. Others state that they are unable to sleep during nighttime operations, even with earplugs; that their retirement or business plans have been disrupted by the noise; that they are unable to have family members visit due to noise; that they cannot enjoy the surrounding Ebey's Reserve area; and that they cannot be outside or engage in their daily activities of living when Growlers are operating. *See, e.g.*, Dkt. 34, at 6; Dkt. 37, at 3; Dkt. 42, at 3; Dkt. 61, at 3.

Plaintiffs, however, then enter unchartered territory by asserting their own understanding of the nature of Naval operations and the impact of these operations on national security. They assert that "when it suits its purposes, the Navy has completely halted Growler operations at NAS Whidbey for extended periods of time since the issuance of the ROD, with no known consequences." Dkt. 29, at 29. The Court notes that when and why the Navy reduces or even halts training operations for a period of time and any resulting consequence on national security if these operations were to be interrupted is clearly beyond plaintiffs' knowledge.

Plaintiffs also argue that the Navy can "continue to train its pilots at the pre-ROD level until a decision is reached on the merits of this case"; could maintain the increased operations,

but conduct 80% of operations at Ault Field; or could even use training locations in other states. Dkt. 29, at 29. They point to an alternative in the EIS that provided for "maintaining the pre-ROD allocation of touch-and-go flights at 80% Ault Field, 20% OLF" as well as the Navy's FCLP operations in other states. Dkt. 29, at 29. However, these assertions are contradicted by the Navy.

The Navy has produced significant evidence that OLF Coupeville is a unique location because it replicates a carrier landing pattern (unlike Ault which "lies in a valley and aircrews must maneuver to avoid the surrounding hills"); OLF Coupeville is rural and dark, mimicking carrier landing conditions; and its use "allows the other vital missions of the base to continue unimpeded." Dkt. 55-1, at 7–9. The Navy states that using other locations "is expensive and disruptive to the Navy's complex and interlocking system of training carrier strike groups," that airfield capacities around the nation do not have excess capacity, that Ault field is not an acceptable substitute, and that even a short restriction on FCLPs would harm Naval operations and thus, the national security. *See* Dkt. 29, at 11, 21–22.

The Navy relies on a variety of declarations supporting these statements. The NASWI commanding officer states that OLF Coupeville is a dedicated location for Growlers, unlike the multi-mission airbase at Ault Field. Dkt. 55-1, at 7. According to the commanding officer, "Ault Field's configuration in no way resembles an aircraft carrier, and it sits in a brightly lit urban area. Furthermore, FCLPs require the training aircraft to dominate the runways for that event and create a bottleneck for other training events." Dkt. 55-1, at 9. Delays at Ault threaten "Maritime Patrol, Fleet Air Reconnaissance, Anti-Submarine Warfare, and Search and rescue missions." Dkt. 55-1, at 10.

1    Similarly, the Electronic Attack Wing Commanding Officer submits that when training

2    pilots for carrier landings in Growlers, FCLPs are necessary since FCLPs "mimic the landing

3    environment of an aircraft carrier" and build "the skills and decision-making necessary for

4    aircrew to safely land a jet aircraft onboard a moving aircraft carrier." Dkt. 55-3, at 5. He states

5    that FCLPs "must be performed close in time (within 10 days) before a squadron deploys to an

6    aircraft carrier because the perishable skills needed to perform the maneuver must peak just as

7    they are needed." Dkt. 55-3, at 6. Further, "[s]ending aviators, instructors[,] and maintenance

8    personnel to detachments to other airfields to obtain FCLP training disrupts the finely-tuned

9    process of training aviators." Dkt. 55-3, at 16.

10    Finally, Vice Admiral DeWolfe Miller, III, states that the addition of aircraft and

11    personnel accomplished by the Growler operations expansion at NASWI "is critical to providing

12    Combatant Commanders with fully trained units that have Growler electronic warfare capability,

13    which is in high demand by Combatant Commanders." Dkt. 55-4, at 3. Further, "[t]he nation's

14    aircraft carriers and associated air wings are the linchpins in the Navy's ability to fulfill its

15    missions and are routinely among the first assets to a crisis." Dkt. 55-4, at 5. Vice Admiral

16    Miller states that the training that occurs at Whidbey Island "cannot be replicated anywhere

17    else." Dkt. 55-4, at 12. He explains in detail the factors that make Whidbey Island unique,

18    including that OLF Coupeville is "custom designed for Growler FCLP"; that OLF Coupeville

19    has the right elevation, wind alignment, lighting, distance from the Growler homefield, airspace,

20    and landing systems; that other airfields are either saturated or lack the necessary attributes for

21    FCLP practice; and that "[a]irfield utilization rates across the Navy are historically high." Dkt.

22    55-4, at 13–16. Regarding an injunction pending the outcome of this litigation, Vice Admiral

23    Miller specifically states that there would be a "critical impact to not only NAS Whidbey Island

24

1  and operations at Ault Field but also on naval aviation readiness across the nation" because there

2  would be a "critical bottleneck of trained aircrew."  Dkt. 55-4, at 16.

3       There is more.

4       In the classified declaration of Vice Admiral Miller submitted to the Court for *in camera*

5  review, the Navy outlines with even greater particularity how the national security could be

6  affected by disrupting these training exercises.  This Court has reviewed this classified material.

7  While the Court recognizes that plaintiffs are at a distinct disadvantage by not being able to view

8  these classified materials, this Court cannot fail to consider these facts when weighing the public

9  interests affected by plaintiffs' motion.

10       As noted, plaintiffs do not appear to challenge that in general, national security is an

11  important public interest.  *See* Dkt. 54, at 2.  Instead, plaintiffs argue, without authority or

12  persuasive evidentiary support, that their preliminary injunction will not harm national security.

13  On this issue, plaintiffs rely on a single declaration from a former air squadron commander who

14  contends that other airfields can replace OLF Coupeville.  Retired Lt. Colonel Clarence Sims,

15  who formerly served as a squadron commander at other locations, offered his opinion regarding

16  OLF Coupeville, and its limitations; however he does not profess to understand the

17  interconnectivity of Naval operations, nor does he address the saturation of other facilities to

18  handle the operations at OLF Coupeville.  *See* Dkt. 62, at 1.  Vice Admiral Miller concludes that

19  the Lt. Colonel's statements that FCLP training can be completed at other locations are "simply

20  not true."  Dkt. 62, at 3–4.

21       Weighing the evidence on this issue, plaintiffs' argument is unpersuasive.  Plaintiffs'

22  evidence does not clearly show that there is a workable alternative to increased Growler

23  operations at OLF Coupeville during the pendency of this litigation.  It is notable that although

24

1    Navy officials' declarations support that other airfields are unworkable due to saturation, retired

2    Lt. Colonel Sims does not address this issue in his declaration—nor would current levels of

3    airfield capacity around that nation be a subject within his personal knowledge.  Lt. Col. Sims

4    disputes the Navy's statements about the uniqueness of OLF Coupeville, including asserting that

5    it is next to a heavily-trafficked road and ferry landing and community lights and that the runway

6    is undersized and located at a suboptimal elevation.  *See* Dkt. 62.  But Lt. Col. Sims' experience

7    does not actually include participating in or supervising FCLPs at OLF Coupeville (unlike the

8    NASWI commanding officer), and the Court must view his statements in this light.

9         In *Winter v. National Resources Defense Council* (555 U.S. 7, 20 (2008)), the Supreme

10   Court discussed the great deference accorded to senior military officials' judgments that training

11   under challenged circumstances was critical to the national defense:

12            This case involves "complex, subtle, and professional decisions as to the
             composition, training, equipping, and control of a military force," which are
13            "essentially professional military judgments."  *Gilligan v. Morgan,* 413 U.S. 1, 10
             [] (1973).  We "give great deference to the professional judgment of military
14            authorities concerning the relative importance of a particular military interest."
             *Goldman v. Weinberger,* 475 U.S. 503, 507 [] (1986).  As the Court emphasized
15            just last Term, "neither the Members of this Court nor most federal judges begin
             the day with briefings that may describe new and serious threats to our Nation and
16            its people." *Boumediene v. Bush,* 553 U.S. 723, 797 [] (2008).

17

18   *Winter*, 555 U.S. at 25.  In *Winter*, the Court accepted senior officials' assertions that the

19   challenged practice was of the "utmost importance to the Navy and the Nation" and found that

20   although the countervailing interests were "serious," the balance of the equities and

21   consideration of the overall public interest" tipped strongly in the Navy's favor.  *Id.*

22            "[M]ilitary interests do not always trump other considerations, and [the Supreme Court

23   has] not held that they do."  *Id.* at 26.  Nonetheless, the "Constitution vests '[t]he complex,

24

1 subtle, and professional decisions as to the composition, training, equipping, and control of a

2 military force' exclusively in the legislative and executive branches" (*Kreis v. Sec'y of Air*

3 *Force*, 866 F.2d 1508, 1511 (D.C. Cir. 1989) (quoting *Gilligan v. Morgan*, 413 U.S. 1, 10

4 (1973)), and "granting the preliminary injunction would require this Court to interfere in the day-

5 to-day decisions required to maintain Navy operations.  *See* 14A C.J.S. Civil Rights § 364

6 ("Temporary injunctive relief may be issued only if it is both practical and appropriate.")

7   Similar to *Winter*, here, the Navy's submissions provide substantial support for the

8 conclusion that the increased Growler presence for training at OLF Coupeville is essential for

9 national security.  In this regard, as in *Winter*, the Court must greatly defer to senior military

10 officials' professional judgments

11   Additionally, it should be noted that if the Court were to assume that the Growler training

12 could occur at Ault Field instead of OLF Coupeville, then plaintiffs' preferred alternative would

13 simply shift the noise to a more populated area.  *See* Dkt. 55-1, at 11.  This "not-in-my-

14 backyard" subverts the public interest by proposing shifting noise to another, more populated

15 community.

16   Finally, denying preliminary injunction in this instance is also consistent with the Court's

17 previous findings, in *COER I*, that plaintiff's interest in avoiding increased noise (there, from the

18 shift to *Growler* aircraft), was outweighed by the public's interest in national security.  *See*

19 *COER I*, 122 F. Supp. 3d at 1085.

20   For these reasons, the Court should find that the balance of the equities and the public

21 interest factors weigh strongly in the Navy's favor.

22 ///

23 ///

24

1
**III. Likelihood of Irreparable Harm in the Absence of Preliminary Relief**

2
Plaintiffs assert that they have shown a likelihood of irreparable harm because the

3
increased overflights are causing hearing loss, inability to live peacefully in their homes, and

4
inability to use and enjoy their surroundings, including the Ebey's Landing National Historic

5
Reserve. Dkt. 29, at 26. They point to their expert's noise monitoring measurements, the

6
Navy's own analyses, the Washington Department of Health's assessment, scientific studies, and

7
their own declarations. Dkt. 29, at 26–27. Defendants respond that "COER's delay in seeking a

8
preliminary injunction, its failure to assert harms that are immediate and irreversible, and its

9
inability to causally tie its alleged injuries to the government action at issue all weigh against

10
granting a preliminary injunction." Dkt. 55, at 13.

11
**A. Plaintiffs' Evidence**

12
Growler operations have been ongoing at Coupeville since well before this litigation—

13
but much of plaintiffs' declarations focus on their unhappiness with *any* Growler operations,

14
rather than the impacts of the *increase* in Growler operations that are at issue in this litigation.

15
The Court focuses on plaintiffs' evidence only as it pertains to injury from these increased

16
operations.

17
Karen Bowman, an advanced practice nurse, opines that exposure to noise from low-

18
flying military aircraft can lead to disruption of daily activities, sleep disturbance, noise induced

19
hearing loss, stress, and severe cardiac problems. Dkt. 33, at 2–3. She opines that,

20
> citizens around OLF Coupeville have increased risk of cardiac disease . . . from the
> frequent noise exposure from the EA-18G Growler jet aircraft field carrier landing

21
> practice operations at OLF Coupeville. The number of FCLP operations has greatly
> increased since the March 2019 Record of Decision, with a corresponding increase

22
> in the health risks faced by the citizens near OLF. . . . Nighttime operations have
> also greatly increased. . . .

23

24

1    Dkt. 33, at 6–7.

2         Residents, most of whom relocated to Coupeville sometime in or after 2005, also provide

3    their declarations claiming harm from increased Growler operations over their homes. *See* Dkt.

4    30, at 1; Dkt. 31, at 1; Dkt. 32, at 1; Dkt. 35, at 1; Dkt. 37, at 1; Dkt. .42, at 1; Dkt. 45, at 1; *but*

5    *see* Dkt. 34, at 1; Dkt. 39, at 1; Dkt. 40, at 1; Dkt. 44; Dkt. 61. These declarations document

6    increased flyovers, with, for example, one resident stating that jets "frequently fly 4-5 days a

7    week, often from late morning until after midnight, once every 45-60 seconds, with only a few

8    short breaks." Dkt. 31, at 3; *see also* Dkt. 34, at 6. Local officials also provide declarations that

9    a preliminary injunction would benefit their communities. *See* Dkt. 43.

10         Plaintiffs also rely on the 2019 report of their acoustic expert, Jerry Lilly, who took noise

11    measurements at 8 locations over several weeks in summer 2019. *See* Dkt. 38-2, at 4. Lilly

12    summarized his findings and opinions as follows:

13    > In that short period of time, residents in the area were exposed to over 29 hours of
      > military jet noise involving over 1,000 overflights, 769 of which exceeded a
14    > maximum sound level of 100 dBA. These new measurements confirm what the
      > local residents already know: that the noise generated by the EA-18G (Growler)
15    > aircraft is at levels approaching that of physical pain, and the frequency of the
      > overflights during the active sessions is such that the noise from the previous
16    > aircraft has not yet dissipated before the next one arrives. Essentially, there is no
      > relief between noise events while the jets are in session.
17    > . . . .
18    >         In total, thirty-three Growler sessions were recorded at eight different
      > locations during these measurements in 2019. The total number of individual
19    > overflights (events) recorded was 1,262. Of these events, 1,085 were above 80 dBA
      > (equivalent to a diesel semi-truck at 50 feet going 50 miles per hour), and 769 were
20    > above 100 dBA (equivalent to or worse than a chainsaw at five feet). It is virtually
      > impossible to adequately communicate the extreme nature and devastating impact
      > of this noise on the community. Numbers simply cannot do it justice.

21

22    Dkt. 38-2, at 4–5.

23    ///

24

1        **B. Analysis**

2            At the outset, as the Court has previously ruled, declarants who moved to the area after

3    1992, when the area around the airfield was locally zoned for noise exceeding 65 decibels, are

4    unlikely to be able to satisfy the irreparable harm requirement because "the harm complained of

5    is self-inflicted." *COER I*, 122 F. Supp. 3d at 1084 (internal quotation omitted). Of more than a

6    dozen declarants in support of this motion for preliminary injunction, only one person has lived

7    in the area continuously since before 1992. *See* Dkt. 61; *see also* Dkt. 40, at 2 (declarant who

8    lived in the area before 1992 but chose to build a retirement home in the area in 2014). This is

9    similar to the situation in *COER I* since here, except for one person, declarants have moved to

10   the area or built a home within the area within the last 25 years. Plaintiffs argue that the Navy

11   represented that noise levels would decrease in 2005, when the Navy switched to Growler

12   aircraft. *See* Dkt. 59, at 11. However, the only declarant to reference this allegedly misleading

13   statement does not claim that it factored into her decision to purchase a home in the area. Dkt.

14   42, at 2–3; *see* Dkt. 30, at 2; Dkt. 31, at 1; Dkt. 32, at 1; Dkt. 34; Dkt. 35, at 1; Dkt. 37, at 1; Dkt.

15   40, at 2; Dkt. 45; Dkt. 46, at 1. Thus, equitable concerns weigh against finding that plaintiffs are

16   suffering irreparable injury justifying a preliminary injunction.

17           In addition, most of plaintiffs' claimed imminent and irreparable harms could be fully

18   compensable through a damages award. The Ninth Circuit has explained that a preliminary

19   injunction is not appropriate unless monetary damages or other legal remedies are inadequate to

20   compensate plaintiffs. *See Herb Reed. Enterprises, LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d

21   1239 ,1249–50 (9th Cir. 2013); *see also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668,

22   676 (9th Cir. 1988). Here, the injuries of loss of home values (*e.g.* Dkt. 45, at 2), cost of home

23   repairs (*e.g.* Dkt. 45, at 2), loss of business (*e.g.* Dkt. 30, at 3–4), and loss of use and enjoyment

24

of their homes and the surrounding areas are the types of injuries that are compensable through a damages award, should plaintiffs succeed in this litigation. *See Cont'l Ins. Co. v. Wehbe*, No. 96 CIV. 1176 (JFK), 1996 WL 109060, at *2 (S.D.N.Y. Mar. 13, 1996) ("[I]t is beyond dispute that injury capable of being fully remedied by money damages does not constitute irreparable harm.").

Thus, the Court focuses on plaintiffs' supporting evidence of risk of hearing loss and other health concerns due to Growler operations because these are plaintiffs' allegations of irreparable harm that cannot be compensated through an award of damages.    *See Postlewaite v. Cole*, No. 14-CV-717-NJR-DGW, 2014 WL 5310698, at *2 (S.D. Ill. Oct. 17, 2014) (finding "irreparable harm in the form of hearing loss").

Having carefully reviewed plaintiffs' arguments and the declarations provided in support of their motion and reply, the Court finds that plaintiffs have not met their heavy burden to show a concrete risk of irreparable harm attributable to the increased Growler operations between now and the resolution of this litigation.

No evidence provided by plaintiffs links their defined level of increased exposure in the immediate future to a specific level of risk of hearing loss or cardiovascular event.  For instance, although plaintiffs' acoustic expert states that Growler flyover generates extremely loud noise that cause "hearing damage . . . with repeated exposure" or "can cause pain and injury," he does not tie the amount of exposure due to increased operations to any particular data about the length of exposure and correlation to hearing loss.  *See* Dkt. 38-2, at 4.

Nor does Nurse Bowman.  *See* Dkt. 33, at 3 (hearing loss "will occur with repeated exposure" and observed noise levels are "high enough to potentially result in permanent hearing loss.").  In *COER I,* the Court noted plaintiffs' failure to provide medical records substantiating

1   their claims.  Yet, again, plaintiffs have failed to provide such medical records. *See COER I*, 122

2   F. Supp. 3d at 1081.

3          Even though the increased operations have continued for more than a year, there is no

4   declarant who claims to have begun suffering from hearing loss due to the increase.  *See, e.g.*,

5   Dkt. 34, at 4 ("While I may not note an immediate loss, continual exposures to noise at this level

6   increase my risk of hearing loss and tinnitus.").  Paula Spina, the one declarant to claim hearing

7   loss, states that her hearing loss occurred *before* the increase in operations.  *See* Dkt. 42, at 4.

8   The Court cannot speculate on potential irreparable injury that will result in future hearing loss

9   when it lacks any evidence of any past hearing loss associated with the same increased

10  operations.  Perhaps people are protecting their hearing in other ways.  One would hope so.  And,

11  if so, they presumably can continue to do so until this matter is finally resolved; thus the risk of

12  imminent irreparable harm has been significantly reduced.

13         Declarants also discuss anxiety and stress from the Navy's operations.  *See, e.g.*, Dkt. 30,

14  at 4; Dkt. 31, at 3; Dkt. 34, at 5, 7; Dkt. 35, at 2; Dkt. 42, at 4; Dkt. 46, at 3.  However, such

15  injury may, if appropriate, be compensated in money damages, but, as the Court has already

16  found, is inadequate to merit injunctive relief:  "[t]he Supreme Court has warned that courts

17  should exercise caution when considering complaints of anxiety and stress related to government

18  action in the context of NEPA challenges."  *COER I*, 122 F. Supp. 3d at 1081.

19         The undersigned is sympathetic to the unquestionable disruption to plaintiffs' lives

20  caused by years of Growler operations at OLF Coupeville and plaintiffs' frustration that their

21  concerns are not being addressed.  *See* Dkt. 45, at 5 ("Should a Court ever read this declaration. .

22  . .").  However, having carefully reviewed all of plaintiffs' scientific evidence and declarations,

23  the undersigned concludes that at this point in the litigation, plaintiffs have yet to come forward

24

1 with the type of concrete, scientific evidence linking their levels of exposure to a particular

2 quantum of risk of hearing loss that would merit the extraordinary remedy of preliminary

3 injunctive relief.

4      Thus, the undersigned recommends that the Court find that plaintiffs have failed to

5 establish a risk of irreparable harm unable to be compensated through a damages award that will

6 occur absent a preliminary injunction.

7 **IV. Likelihood of Success on the Merits**

8      Plaintiffs assert that they are likely to succeed on the merits because they have shown that

9 defendants used statistically misleading annual noise averages rather than comparing busy and

10 quiet days before and after the increase in operations, that defendant ignored the effects of

11 noisier engines, failed to take real-world measurements, and improperly failed to adopt a federal

12 council's recommendations. *See* Dkt. 29, at 14–26. The District Court should not reach these

13 arguments at this stage of the litigation because if the District Court agrees that national security

14 interests are at stake, and plaintiffs have not shown a risk of imminent, irreparable harm, then the

15 issuance of a preliminary injunction is not appropriate in any event. *See Winter*, 555 U.S. at 22

16 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent

17 with our characterization of injunctive relief as an extraordinary remedy that may only be

18 awarded upon a clear showing that the plaintiff is entitled to such relief.").

19      If the District Court reaches plaintiffs' arguments on this point, it should find that at this

20 stage of the litigation, plaintiffs have not yet shown a likelihood of success on the merits under

21 the highly deferential standard of review applicable here.

22 ///

23 ///

24

1    **A.  Standard of Review**

2        Plaintiffs' NEPA and NHPA arguments are evaluated under the APA.  *Ranchers*

3    *Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 415 F.3d

4    1078, 1102 (9th Cir. 2005), *as amended* (Aug. 17, 2005); *San Carlos Apache Tribe v. United*

5    *States*, 417 F.3d 1091, 1095 (9th Cir. 2005).  The APA is deferential to an agency (*see San Luis*

6    *& Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 992 (9th Cir. 2014)) and, as relevant here,

7    requires that before the Court will intercede in agency action, plaintiff must prove that an action

8    was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law"

9    or "without observance of procedure as required by law."  *See* 5 U.S.C. § 706(2)(A), (D).

10        Plaintiffs bring claims under NEPA, which "mandates only a process that the agency

11    must follow."  *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't*

12    *of Agric.*, 415 F.3d 1078, 1102 (9th Cir. 2005), *as amended* (Aug. 17, 2005).  "NEPA imposes

13    only procedural requirements to 'ensur[e] that the agency, in reaching its decision, will have

14    available, and will carefully consider, detailed information concerning significant environmental

15    impacts.'"  *Winter*, 555 U.S. at 23 (internal citation omitted).  NEPA's procedural requirements

16    force agencies to take a "hard look" at environmental consequences.  *See League of Wilderness*

17    *Defenders v. Connaughton*, 752 F.3d 755, 763 (9th Cir. 2014).  NEPA requires the preparation of

18    an EIS where there are "major Federal actions significantly affecting the quality of the human

19    environment."  42 U.S.C. § 4332(2)(C); *see also Or. Nat. Desert Ass'n*, 840 F.3d at 568.

20        Plaintiffs also bring a claim under NHPA, "a procedural statute requiring government

21    agencies to 'stop, look, and listen' before proceeding with agency action."  *Te-Moak Tribe of W.*

22    *Shoshone of Nev. v. U.S. Dep't of the Interior*, 608 F.3d 592, 610 (9th Cir. 2010).  The statute

23    "requires a federal agency to 'take into account the effect of [any] undertaking on any district,

24

site, building, structure, or object that is included in or eligible for inclusion in the National

Register.'" *Morongo Band of Mission Indians,* 161 F.3d at 581 (internal citation omitted); *see*

*also* 54 U.S.C. § 306108. "An agency is expected to consult with various interested parties

throughout the § 106 process, including the State Historical Preservation Officer (SHPO), who is

the state official appointed or designated . . . to administer the state historic preservation

program." *Id.* (citing 36 C.F.R. § 800.16(v)). "The ACHP itself must be afforded a 'reasonable

opportunity to comment on such undertakings.'" *Friends of the Atglen-Susquehanna Trail, Inc.*

*v. Surface Transp. Bd.*, 252 F.3d 246, 252 (3d Cir. 2001) (quoting 36 C.F.R. § 800.1(a)).

The final step of this process is "the resolution of adverse effects and the development of

a plan to avoid, minimize, or mitigate the adverse effects." *Id.* at 253. If an agency terminates

consultation, as allowed by 36 C.F.R. § 800.7(a), it must request and receive ACHP comments.

36 C.F.R. § 800.7(a)(1).

> The agency must take these comments into account in reaching a final decision on
> the undertaking, *see* 36 C.F.R. § 800.7(c)(4), and the agency is required to
> document that it did so by explaining its decision and providing evidence that it
> considered the ACHP's comments. *See* 36 C.F.R. § 800.7(c)(4)(i); *see also*
> *Concerned Citizens*, 176 F.3d at 696 (stating that the "relevant agency must
> demonstrate that it has read and considered" the opinions and recommendations of
> the ACHP).

*Friends of the Atglen-Susquehanna Trail, Inc.*, 252 F.3d at 254.

### B. Plaintiffs' Arguments

Under NEPA, plaintiffs argue that the Navy acted arbitrarily or capriciously by

misleadingly comparing pre- and post-operations-increase day-night noise metric ("DNL") that

averaged noise for all days over a year (an "annual metric"), regardless of flight levels on

particular days. *See* Dkt. 29, at 16–17. They assert that the way that defendants used the DNL

metric is misleading where activity is intermittent—i.e. with "busy" and "quiet" days. Plaintiffs

1    also argue that the Navy failed to take into account that Growlers now use noisier engines.  *See*

2    Dkt. 29, at 20 (citing GRR 171303).  Finally, plaintiffs argue that the Navy failed to conduct

3    real-world modeling:  "an affordable, real world laboratory was readily available to measure the

4    precise noise levels generated by these planes at the locations of concern and then simply

5    extrapolate from those measurements to predict the frequency that those noise levels would

6    occur with the additional panes and the new 80-20 split."  Dkt. 29, at 20.  Plaintiffs assert that

7    their expert's real-world measurements reveal noise significantly in excess of that predicted in

8    the EIS.  *See* Dkt. 29, at 22.

9           The undersigned has reviewed plaintiffs' arguments and notes that they fall within an

10    area where the Court must be highly deferential to the Navy's choices.  First, the Court must

11    defer to an Agency's decision under the APA, if the decision is not arbitrary or capricious, even

12    if the Court would not come to the same decision itself.  Second, a Court tasked with reviewing a

13    choice of scientific analyses (such as choice of measurements, projections, or analyses) must be

14    deferential to the Agency's technical judgments.  *See, e.g.*, *Idaho Wool Growers Ass'n*, 816 F.3d

15    at 1107 (quoting *Lands Council*, 395 F.3d 1031) ("When an agency undertakes technical

16    scientific analyses, as with the development of models to help analyze a problem, the court's

17    deference to the agency's judgment is at its peak.").  Most of plaintiffs' arguments fit within this

18    category of challenging an Agency's decision between alternative types of analyses and

19    measurement—where the Court's deference to the Navy is at its zenith.  *See City of Bridgeton v.*

20    *FAA*, 212 F.3d 448, 459 (8th Cir. 2000) (the agency, "not a reviewing court, 'is entrusted with

21    the responsibility of considering the various modes of scientific evaluation and theory and

22    choosing the one appropriate for the given circumstances); *Morongo Band of Mission Indians v.*

23    *F.A.A.*, 161 F.3d 569, 577 (9th Cir. 1998).  Regarding plaintiffs' claims that the Navy violated

24

1    NHPA, it must be noted that the Navy followed the NHPA guidelines by notifying the ACHP of

2    the termination of consultation with the Washington Historical Preservation Officer, soliciting

3    feedback from the ACHP, and explaining which parts of this feedback the Navy was not

4    incorporating and why.  *See* GRR 167463–65, 167574; *see also Wisconsin Heritages, Inc. v.*

5    *Harris*, 490 F. Supp. 1334, 1341 (E.D. Wis. 1980).  Plaintiffs' challenges under the NHPA rely

6    on reiteration of many of their same arguments challenging the Navy's choice of measurements

7    and modelling.  *See* Dkt. 59, at 8–9.  Finally, regarding the claimed use of enhanced, noisier

8    engines, plaintiffs do not point to any evidence other than their own comments in the record

9    relying on a fact sheet stating that engines *could be enhanced*.  *See* Dkt. 59-2, at 2–3 (emphasis

10   added).

11        Finally, it must be observed that plaintiffs' arguments are under statutes mandating a

12   procedure to be followed, not a result to be obtained.  Therefore, it is questionable whether this

13   Court through preliminary injunction should mandate the result of reduced Growler operations

14   even if it were to ultimately require that the Department redo the procedure for evaluating the

15   impact of those increased operations.

16        Therefore, the Court should not further inquire into the merits of plaintiffs' arguments at

17   this early stage and should find that these arguments do not yet establish a likelihood of success

18   on the merits.

19                                    **CONCLUSION**

20        Plaintiffs have failed to establish the requirements for a preliminary injunction to issue.

21   Therefore, their motion for a preliminary injunction should be denied.  *See* Dkt. 29.

22        Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

23   fourteen (14) days from service of this Report to file written objections.  *See also* Fed. R. Civ. P.

24   6.  Failure to file objections will result in a waiver of those objections for purposes of *de novo*

review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Miranda v. Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **August 7, 2020** as noted in the caption.

Dated 22nd day of July, 2020.

J. Richard Creatura
United States Magistrate Judge