1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9

10   STATE OF WASHINGTON, *et al.*,

11          Plaintiffs,

12      v.

13   UNITED STATES DEPARTMENT
     OF THE NAVY, *et al.*,

14

          Defendants.

15

CASE NO. 2:19-cv-01059-RAJ-JRC

REPORT AND RECOMMENDATION

NOTED FOR: December 31, 2021

16        The District Court has referred this consolidated case to the undersigned.  Dkt. 19.  The

17   matter is before the Court on cross-summary judgment motions filed by plaintiffs Citizens of the

18   Ebey's Reserve for a Healthy, Safe, and Peaceful Environment and Paula Spina (collectively

19   "COER"); the State of Washington; and defendants the U.S. Department of the Navy, Mark

20   Esper, Richard Spencer, Todd Mellon, Mathew Arny, and the U.S. Fish and Wildlife Service

21   (collectively "the Navy").  Dkts. 87, 88, 92.

22        Plaintiffs challenge the Navy's 2018 final environmental impact statement ("FEIS") and

23   2019 record of decision authorizing the expansion of EA-18G "Growler" aircraft operations at

24   the Naval Air Station Whidbey Island ("NASWI") under the National Environmental Policy Act

("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, the National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 470 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551, *et seq.* These statutes mandate a procedure that an agency must follow before taking an action as significant as the Growler expansion at NASWI.

Under NEPA and the APA, the Navy's decision may be overturned if the Navy acted "arbitrarily and capriciously" and failed to take a "hard look" at the consequences of the proposed action.

Here, despite a gargantuan administrative record, covering nearly 200,000 pages of studies, reports, comments, and the like, the Navy selected methods of evaluating the data that supported its goal of increasing Growler operations.  The Navy did this at the expense of the public and the environment, turning a blind eye to data that would not support this intended result.  Or, to borrow the words of noted sports analyst Vin Scully, the Navy appears to have used certain statistics "much like a drunk uses a lamppost:  for support, not illumination."

When reporting on the environmental impact of Growler fuel emissions, the Navy underreported the true amount of Growler fuel emissions and failed to disclose that it was not including any emissions for flights above 3,000 feet.   Even after receiving a comment on the issue, the Navy failed to disclose its underreporting and dismissed the issue with broad generalities.

With respect to the impact of this increased operation on childhood learning, the Navy acknowledged numerous studies that concluded that aircraft noise would measurably impact learning but then arbitrarily concluded that because it could not quantify exactly how the increased operations would interfere with childhood learning, no further analysis was necessary.

As to the impact of increased jet noise on various bird species, the Navy repeatedly stated that increased noise would have species-specific impacts on the many bird species in the affected area but then failed to conduct a species-specific analysis to determine if some species would be more affected than others.  Instead, the Navy simply concluded that certain species were not adversely affected and then extrapolated that all the other species would not be affected, either.

Regarding evaluating reasonable alternatives to the Growler expansion at NASWI, which the Navy was required to do, the Navy rejected moving the Growler operations to El Centro, California out of hand, summarily concluding that such a move would cost too much and that moving the operation to that location would have its own environmental challenges.  The Navy's cursory rationale was arbitrary and capricious and does not provide a valid basis to reject the El Centro alternative.

For these reasons, the Court recommends that the District Court find the FEIS violated the NEPA and grant all summary judgment motions in part and deny them in part.  Dkts. 87, 88, 92.  Also, the Court grants plaintiffs leave to submit extra record evidence to address certain issues.  Dkt. 85.  Assuming the District Court follows this recommendation, it should order supplemental briefing regarding the appropriate remedy for the NEPA violations described herein.

## BACKGROUND

### I. The Affected Area

NASWI operations take place on Whidbey Island, which is nestled within the Island County portion of the Salish Sea.  Approximately 80,000 people live in Island County (including on Whidbey Island), and approximately another 121,000 people live in nearby Skagit County. *See* GRR 150511 (2016 figures).  The area around NASWI is predominantly rural (GRR

150397), and Island County values its "rural character and natural beauty[.]"  GRR 150407 (quotation marks omitted).

Whidbey Island is in a region of Puget Sound that has significant environmental resources.  The San Juan Islands National Wildlife Refuge and five other important bird areas are within the action area for increased Growler operations.  GRR 150473, 150476.  The Refuge is a mere six miles from Ault Field and protects colonies of nesting seabirds, including black oystercatchers and pigeon guillemots.  GRR 150476.  The tufted puffin—a State-listed endangered species—lives in a portion of the affected area.  *See* GRR 151276.  All in all, approximately 230 migratory bird species occur annually within the FEIS's study area.  GRR 150470.

Whidbey Island is also home to important historic areas, including the Ebey's Landing National Historic Reserve ("Ebey's Reserve") and the Central Whidbey Island Historic District (the "Central Historic District").  GRR 151216, 151250.  Ebey's Reserve—federally protected since 1978—preserves an area with an unbroken historic record from nineteenth century exploration and settlement in Puget Sound to the present.  GRR 151216.  A significant portion of OLF Coupeville—the airfield with the greatest Growler expansion—lies within the boundaries of Ebey's Reserve.  *See* GRR 160140.  Ebey's Reserve's boundaries also coincide with the Central Historic District (nominated to the National Register of Historic Places in 1973), which contains one of the largest intact collections of nineteenth century residential and commercial structures in rural Washington State.  GRR 164965–66.

## II.  NASWI Operations

The Navy has operated NASWI on Whidbey Island since 1942.  GRR 150433; *see also* GRR 150435 (OLF Coupeville constructed in 1944).  Ault Field, the main NASWI air station, is

located near the city of Oak Harbor on Whidbey Island, and OLF Coupeville, dedicated

primarily to Field Carrier Landing Practice ("FCLP"), is located approximately ten miles south.

GRR 150141.  Jet aircraft began operating at NASWI in the 1950s, and by 1971, NASWI was

the home base for the Navy's tactical electronic warfare squadrons.  GRR 150433.  Since 1967,

the Navy has continuously used OLF Coupeville for FCLP, with activity levels varying.  GRR

150435.

      According to the Navy, FCLP is an essential part of operations at NASWI that Navy

pilots must perform in order to maintain their qualifications for aircraft carrier landings.  GRR

150213.  FCLP is similar to a "touch and go."  *See* GRR 150328 (explaining that FCLP

simulates landing on an aircraft carrier at sea).  A training typically takes approximately 45

minutes, with three to five aircraft participating in the training and remaining within 800 feet of

the ground.  GRR 150213, 150328.  Concentrated periods of high-tempo operations precede

periods of little to no activity.  GRR 150213.

      Residents near OLF Coupeville assert that these low-flying training activities make being

outdoors "unbearable," render even indoor conversations inaudible, and cause shaking and

vibration, with one resident comparing the vibration caused by flyovers to shaking "like there's

an earthquake."  *See* GRR 151712, 151817, 152009.  COER cites a noise study in which its

expert concluded that sound exposure from Growler flyovers at various points on Whidbey

Island exceeded 100 decibels—the point at which continuous exposure for more than 15 minutes

affects hearing.  *See* GRR 60527, 60532.  COER's expert concluded that Growler flyovers

sometimes approached 120 decibels (*see* GRR 60527), and COER asserts that the Navy itself

forbids personnel from unprotected exposure to noise over 115 decibels.  GRR 113628.

1    Operations at OLF Coupeville have accordingly been a font of litigation against the

2    Navy.  In 1992, Whidbey Island residents who owned property around OLF Coupeville brought

3    suit against the Navy for taking their property in violation of the Fifth Amendment, based on the

4    amount of noise that FCLP generated.  *See Argent v. United States*, 124 F.3d 1277, 1279 (Fed.

5    Cir. 1997).  In 2008, the Navy transitioned from "Prowler" to "Growler" aircraft, and in 2013,

6    COER brought suit against the Navy, claiming that the Navy should have prepared an

7    environmental impact statement ("EIS") related to the change.  *See COER v. U.S. Dep't of the*

8    *Navy*, 122 F. Supp. 3d 1068, 1072 (W.D. Wash. 2015).  According to opponents of the increase,

9    the Growlers are even noisier than the Prowlers.  GRR 151216.

10   As part of the 2013 lawsuit, the Navy agreed to prepare an EIS regarding activities at

11   NASWI, although it stated that it would be evaluating the effects not only of existing Growler

12   operations, but of adding additional Growler aircraft.  *See COER*, 122 F. Supp. 3d at 1076.  That

13   EIS forms the basis for this lawsuit.

14   **III.  The EIS and ROD at Issue Here**

15   In November 2016, the Navy released the draft EIS and solicited comments and

16   responses from the public.  *See* GRR 150142.  After reviewing thousands of comments, the Navy

17   prepared the FEIS.  *See* GRR 167643–44.

18   The FEIS, released in September 2018, included a detailed analysis of three alternative

19   scenarios to a "No Action Alternative."  GRR 150142–43.  Each of the three scenarios involved

20   adding additional Growler aircraft and personnel.  *See* GRR 150143.  The Navy also considered

21   various allocations of FCLP practice between Ault Field and OLF Coupeville.  GRR 150144.

22   Shortly before releasing the FEIS, in June 2018, the Navy announced that it preferred

23   Alternative 2, Scenario A, because this was the alternative that best met operational demands.

24

GRR 150142.  Alternative 2 would "establish[] two new expeditionary squadrons, add[] two additional aircraft and additional squadron personnel to each of the nine existing carrier squadrons, and augment[] the FRS [Fleet Replacement Squadron] with eight additional aircraft and additional squadron personnel (a net increase of 36 aircraft)."  GRR 150143.  Scenario A reallocated FCLPs so that twenty percent would take place at Ault Field and eighty percent would take place at OLF Coupeville.  GRR 150144.

The Navy concluded that this alternative least disrupted other operations at Ault Field, provided the best training for pilots, and impacted the fewest residents.  GRR 150142.  According to the Navy, FCLP reallocation to OLF Coupeville "best replicates the carrier landing pattern" and has a "low level of man-made lighting" so that it "provides the most realistic FCLP training in the Northwest Region."  GRR 150303.  The FEIS also states that the Navy used precision landing technology and other changes to reduce the amount of FCLP by 30% from the draft EIS estimates.  GRR 150303.

The FEIS estimates that Alternative 2, Scenario A would result in "88,000 total operations" at Ault Field and "24,100" at OLF Coupeville, constituting about 12,000 FCLP "passes" annually at OLF Coupeville.  GRR 150303.  Moreover, based on the use of a 65 decibel ("dB") day-night average sound level ("DNL"), between 1,879 and 1,312 people would be exposed to noise above a 65 dB DNL noise contour under the various alternatives.  GRR 150146.  The Navy also concluded that there would be "some additional sensory disturbance impacts" to animals in the study area but that these animals were "already exposed to high levels of aircraft operations and other human disturbances."  GRR 150150.  And the Navy predicted that mobile greenhouse gas emissions would increase by approximately 25% to 40% under the various alternatives, although the Navy emphasized that the increase in emissions from the proposed

1  action "equates to less than 1 percent of all aircraft [greenhouse gas] emissions in Washington."

2  GRR 150153.

3       Based on the FEIS, in March 2019, the Navy issued the Record of Decision ("ROD")

4  authorizing the expansion.  GRR 167640.  In the ROD, and relying on the analysis in the FEIS,

5  the Navy expanded operations by adding 36 Growlers (for a total of 118 aircraft), adding two

6  new expeditionary squadrons and additional personnel, and increasing annual airfield operations

7  by 33%.  GRR 167460, 167646–47.  The effect of this expansion was a four-fold increase (90

8  hours per year to 360 hours per year) in aircraft activity at OLF Coupeville.  GRR 167647.

9  **IV.  This Litigation**

10       Within four months, plaintiffs brought separate suits in this Court, which have been

11  consolidated under this cause number.

12       Plaintiffs also brought a motion for preliminary injunctive relief, which the Court denied.

13  *See* Dkt. 72, *adopted by* Dkt. 82.  Although that motion included certain arguments similar to

14  those raised herein, the Court recommended that the District Court decline to reach the merits of

15  plaintiffs' NEPA and NHPA arguments.  *See* Dkt. 72, at 19.

16       Now before the Court are the parties' cross-summary judgment motions and COER's

17  motion for leave to submit extra-record evidence.  Dkts. 85, 87, 88, 92.  The Court held oral

18  argument on the summary judgment motions on October 26, 2021, and these matters are ripe for

19  decision.  *See* Dkt. 106.

20  **DISCUSSION**

21  **I.  Summary Judgment Legal Principles**

22       Summary judgment is appropriate when "there is no genuine issue as to any material fact

23  and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In an

24

1  administrative review case, like this one, the administrative record provides the relevant facts,

2  and the legality of the agency's decision based on those facts is a question of law.  Accordingly,

3  summary judgment is an appropriate vehicle for resolving a case such as this one.  *See Nw.*

4  *Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471–72 (9th Cir. 1994).

5  **II.  NEPA Arguments**

6      **A.  Legal Principles**

7      NEPA forms the "basic national charter for protection of the environment."  *Ctr. for*

8  *Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008)

9  (internal citation and quotation marks omitted).  It is a "procedural statute"—not a substantive

10  one.  *See* 40 C.F.R. § 1500.1.  That is, NEPA mandates a process to be followed, but it does not

11  mandate a particular outcome.  *Ranchers Cattlemen Action Legal Fund United Stockgrowers of*

12  *Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1102 (9th Cir. 2005), *as amended* (Aug. 17, 2005);

13  *see also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)

14  ("NEPA merely prohibits uninformed—rather than unwise—agency action.").  In fact, an agency

15  decision is acceptable even if there will be negative environmental impacts resulting from it, so

16  long as the agency considered these costs and still decided that other benefits outweighed

17  them.  *See Robertson*, 490 U.S. at 350.

18      Under NEPA, an agency must prepare an EIS for "major Federal actions significantly

19  affecting the quality of the human environment[.]"  42 U.S.C. § 4332(C).  "[A] reviewing court

20  will take a 'hard look' at the EIS to determine whether it 'contains a reasonably thorough

21  discussion of the significant aspects of the probable environmental consequences.'"  *Protect Our*

22  *Communities Found. v. Jewell*, 825 F.3d 571, 579 (9th Cir. 2016) (quoting *Churchill Cty. v.*

23  *Norton*, 276 F.3d 1060, 1071–72 (9th Cir. 2001)).  The agency, in turn, must also have taken a

1    "hard look" at the environmental impacts of its proposed action.  *Ctr. for Biological Diversity*,

2    538 F.3d at 1194.

3           Review of agency decisions under NEPA is available under section 706 of the

4    Administrative Procedure Act ("APA").  5 U.S.C. § 706; *City of Sausalito v. O'Neill*, 386 F.3d

5    1186, 1205–06 (9th Cir. 2004).  An agency's action must be upheld unless it is "arbitrary,

6    capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. §

7    706(2)(A).  The Court does not substitute its judgment for that of the agency under this standard.

8    *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1074 (9th Cir. 2011).  The

9    Court will reverse a decision as arbitrary and capricious—

10           only if the agency relied on factors Congress did not intend it to consider, entirely
             failed to consider an important aspect of the problem, or offered an explanation that
11           runs counter to the evidence before the agency or is so implausible that it could not
             be ascribed to a difference in view or the product of agency expertise.
12

13   *Id.* at 1074–75 (internal citation and quotation marks omitted).

14          One would think that with a nearly 200,000-page record, it would not be hard to convince

15   a court that the Navy took a "hard look" at the impacts on people and the environment.

16   However, the value of the record is not in its breadth but in its ability to inform the Navy's

17   decision.  In this, unfortunately, the record is lacking.

18                          **B.  Greenhouse Gas Emissions**

19          COER asserts that the FEIS significantly underestimated Growler fuel emissions and

20   failed to disclose that the Navy left out certain emissions.  *See* Dkt. 87, at 36.

21          The Navy's no-action alternative average year air emissions for NASWI calculated total

22   emissions as approximately 64 million pounds of fuel.  *See* GRR 159667.  But, according to Dr.

23   Christopher Graecen, the "real world data" indicates that Growler fuel usage is much greater

24

1    than the Navy disclosed.  Dkt. 86, at 36.   COER points to extra-record evidence that the NASWI

2    fuels management officer disclosed that in 2016, Growlers alone used more than 137 million

3    pounds of fuel.  *See* Dkt. 86, at 5.  COER asserts that "[b]ecause the actual fuel use was 2.18

4    times more than was assumed for the EIS emission calculations, the actual greenhouse gas

5    emissions are roughly 2.18 times more than the EIS projections, too."  Dkt. 86, at 5.

6         Moreover, COER points to extra-record evidence that based on 2012 data, Growlers used

7    more than five times the amount of fuel estimated in the draft EIS and that based on 2015 data,

8    Growlers used more than three times the amount of fuel estimated in the FEIS.  *See* Dkt. 86, at 9.

9    COER also points to an October 2020 email from counsel for the Navy, in which the Navy's

10   counsel acknowledges that the Navy "did not consider usage of the entire amount of fuel issued

11   to Navy Growlers."  Dkt. 86-4, at 2.  Instead, the Navy cited to a 1992 Environmental Protection

12   Agency ("EPA") document regarding procedures for "emission inventory preparation" for

13   mobile sources.  *See* GRR 14684 (formatting removed).  This document (which is not a part of

14   the FEIS) indicates that according to the EPA, emissions above 3000 feet need not be included in

15   emissions modeling.  GRR 14699; *see also* GRR 14868.

16        COER asks this Court to consider this additional evidence, which is not part of the

17   administrative record.  Dkt. 85.  The Navy objects on the grounds that the request was

18   "untimely" and that allowing extra-record declarations leads to de novo review of an agency's

19   action, rather than appropriate deference to an agency's judgments.  *See* Dkt. 91, at 2–3.

20         In general, review of an agency decision is limited to the administrative record.  *Lands*

21   *Council v. Powell*, 395 F.3d 1019, 1029 (9th Cir. 2005).  A narrow exception to this general rule

22   exists, as relevant here, "(1) if admission is necessary to determine 'whether the agency has

23   considered all relevant factors and has explained its decision. . . .'"  *Id.* at 1030 (internal citation

24

1   omitted).  Thus, although the Court does not generally allow extra-record evidence for the

2   purpose of engaging in a de novo review of the agency decision, the Court will allow such

3   evidence for the limited purpose of determining whether there are matters that the Navy did not

4   include or disclose while preparing the FEIS and of which the public should have been informed.

5       Here, it appears that is exactly what happened.  Contrary to the Navy's alternative

6   argument, the motion was not "untimely" because the deadline referred to by the Navy was for

7   arguing the sufficiency of the record, not whether to allow evidence outside that record.  *See* Dkt.

8   91, at 2.  COER's motion to admit the evidence is granted.

9       If the court were to rely entirely on the administrative record, it would not have a full

10  perspective of this issue and would be unable to determine whether the Navy fully explained its

11  decision.  *See Lands Council*, 395 F.3d at 1030.  NEPA requires up-front disclosures of relevant

12  shortcomings in data or models.  *Id.* at 1032.  An EIS is inadequate where it fails to disclose

13  relevant shortcomings and consideration of relevant variables.  *See id.*  Here, for example, the

14  FEIS does not reveal that fuel calculations above 3,000 feet were omitted.  Despite a plethora of

15  citations to studies, appendices, and calculations, nowhere in the FEIS does the Navy disclose

16  that these emission calculations eliminate from the analysis all emissions above 3,000 feet.  *See*

17  GRR 150391–92, 150772–73, 159662–63.

18      In fact, in the entirety of the FEIS, this Court could find only one reference to the

19  omission of emissions above 3,000 feet.  This is in a footnote estimating emissions for a single

20  landing-takeoff cycle "with straight in Arrival" at OLF Coupeville, which states that "climbout"

21  on departure ceases at 3,000 feet.  GRR 159663.  This is, to the Court's knowledge, the only

22  statement in the FEIS that indicates a limitation of emissions calculations to those below 3,000

23  feet, and it is only in reference to departures as part of a landing-takeoff cycle at OLF

24

Coupeville.  *See* GRR 159663.  Notably, another table in Appendix B makes clear that landing-takeoff cycles at OLF Coupeville are just one type of several operations contributing to Growler emissions.  GRR 159662.  As to other emissions above 3,000 feet—silence.

The Court further observes that Dr. Graecen brought the discrepancy in fuel emission figures to the Navy's attention during the draft EIS process.  *See* GRR 154092.  Dr. Graecen commented that he believed the draft EIS substantially underestimated emissions, based on certain real-world data that he had obtained.  GRR 154092.

In response, the Navy obliquely referenced its use of "the most recently available data and methods from" the EPA and Washington State Department of Ecology and again referred to Appendix B as disclosing the assumptions upon which the Navy based emissions calculations.  *See* GRR 161364–65.  The Navy failed to address reasons for the discrepancy, failed to disclose that it was not calculating emissions above 3,000 feet, and failed to otherwise discuss its response to the issue raised by Dr. Graecen.

NEPA requires the Navy to "respond to comments" on the draft EIS and "discuss at appropriate points in the final statement any responsible opposing view which was not adequately discussed in the draft statement and . . . indicate the agency's response to the issues raised."  Former 40 C.F.R. § 1502.9(b) (eff. to Sept. 13, 2020); *see also* former 40 C.F.R. § 1503.4(a) (eff. to Sept. 13, 2020) (discussing possible responses to comments).  The Navy's response to Dr. Graecen's comment was inadequate.

### C.  Impacts on Child Learning

The Navy concluded that under the various alternatives to taking no action, classroom interference at several schools would increase by "up to one-third[.]"  GRR 161324.  Indeed, the ROD estimates a significant increase in hourly additional classroom interference events for many

1    points of interest.  *See* GRR 167649.  The Navy implicitly acknowledges that the FEIS's analysis

2    essentially stopped at this point.  The Navy does not argue that the FEIS analyzed the

3    significance of the increased classroom interference by, for instance, estimating impacts on

4    reading comprehension, test scores, or other metrics.  Instead, the Navy asserts that it was not

5    required to do so because the link between high aircraft noise levels and impaired learning was

6    too tenuous to measure.  *See* Dkt. 92, at 41–42.

7           The State argues that the Navy simply recognized that classroom interruptions would

8    increase, leaving the reader to "connect the dots" to how this would impact child learning.  *See*

9    Dkt. 88, at 21.  This Court finds that the Navy's analysis fell short when it concluded that

10   available literature was inadequate to quantify impacts on child learning even while citing

11   numerous studies identifying quantifiable impacts.  Based on its own summary, the Navy should

12   have further evaluated the extent to which increased operations would harm children's learning.

13          "An EIS need not discuss remote and highly speculative consequences."  *Ground Zero*

14   *Ctr. For Non-Violent Action v. U.S. Dep't of the Navy*, 383 F.3d 1082, 1090 (9th Cir. 2004).

15   However, an agency cannot shirk its obligations under NEPA by claiming that consequences are

16   too speculative, because NEPA expects an EIS to include "reasonable forecasting and

17   speculation."  *See Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1072 (9th Cir. 2002) ("If

18   it is reasonably possible to analyze the environmental consequences . . . the agency is required to

19   perform that analysis.").  Where there is insufficient information for reasonable forecasting, the

20   agency must make clear that the information is lacking.  Former 40 C.F.R. § 1502.22 (eff. to

21   Sept. 13, 2020).  For instance, an agency does not have to measure or attempt to forecast

22   environmental impacts in an EIS if the available literature shows that the agency cannot quantify

23

24

1    those impacts.  *See, e.g.*, *Off-Rd. Bus. Ass'n. v. U.S. Dep't of Interior*, No. 03 CV 1199-B(POR),

2    2006 WL 8455349, at *4 (S.D. Cal. Dec. 15, 2006).

3            The Navy's analysis of scientific literature concludes that there is a "potential link

4    between aircraft noise and both reading comprehension and learning motivation."  GRR 159320.

5    The very studies that the Navy summarized include measurable links between aircraft noise and

6    lower reading and mathematics scores, solving puzzles, deficits in long-term memory and

7    reading comprehension, recognition memory, and failure rates.  GRR 159322; *see also* GRR

8    150336–37.  Yet, the Navy simply failed to make any attempt to quantify the degree of impact

9    on child learning caused by the increase in Growler operations.  Instead, after stating that it could

10   not accurately quantify the impact of increased operations, the Navy refused to engage in further

11   analysis.

12           It was arbitrary and capricious not to further evaluate the extent of the impact on child

13   learning, based on the Navy's own summary of the scientific literature.  *See Nat'l Audubon Soc'y*

14   *v. Dep't of Navy*, 422 F.3d 174, 192, 194 (4th Cir. 2005)  ("The Navy's cursory review of

15   relevant scientific studies, however further illustrates its failure to take a hard look at the

16   environmental impacts of an [outlying landing field]. . . .  An agency's hard look should include

17   neither researching in a cursory manner nor sweeping negative evidence under the rug.").

18           Moreover, the Navy's analysis violated former 40 C.F.R. § 1502.22(a), which required

19   that an agency include in an FEIS information that is "relevant to reasonably foreseeable

20   significant adverse impacts" and "essential to a reasoned choice among alternatives" if the

21   "overall costs of obtaining [the information] are not exorbitant."  Section 1502.22(b) does not

22   require an agency to include such information if the "means to obtain it are not known[.]"  But as

23   noted above, the Navy's own summary of the evidence indicated that there were means to obtain

24

1    information about the impact, and the Navy failed to take a hard look at those impacts or include

2    that information.

3           It is not for this Court to tell the Navy how to measure quantifiable impacts from aircraft

4    noise on child learning, but the Navy cannot simply rely on studies indicating quantifiable

5    impacts while simultaneously ignoring the significance of those studies.  Therefore, the Court

6    finds that the FEIS failed to take a "hard look" at the effect of classroom interference that would

7    result from increased Growler operations.

8                            **D.  Bird Impacts**

9           The State argues that the Navy also failed to take a "hard look" at the effect of increased

10   Growler operations on bird species in the affected area.  Dkt. 88, at 30.

11          Regarding birds, the FEIS repeatedly stated that responses to aircraft noise were species

12   specific—that is, different species responded very differently to aircraft noise.  *See* GRR 150911.

13   Citing various scientific studies, the FEIS stated that "[b]ehavioral reactions to aircraft

14   overflights are dependent on species and activity at the time of the stimulus"; that some birds

15   reacted at noise levels over 60 dBA but others did not react to overflights of up to 101 dBA; that

16   "not all birds react to overflights"; that habituation had been noted in some species but "not all

17   species exhibit the same pattern of habituation, and residual effects are possible"; and that

18   although overflights generally did not affect various reproductive activities, "flushing of nesting

19   seabirds" could do so.  GRR 150911–13.

20          The Navy claims that the FEIS did, in fact, thoroughly discuss the different species of

21   birds impacted by the increase in operations.  *See* Dkt. 92, at 47–48.  The Court has read each of

22   more than two dozen citations that the Navy offered in support of this proposition.  *See* Dkt. 92,

23   at 47–48.  Most of them—for reasons that are not apparent—are citations to materials outside the

24

1    FEIS.  *But see* former 40 C.F.R. § 1502.24 (eff. to Sept. 13, 2020) (NEPA requires that the FEIS

2    itself "make explicit reference . . . to the scientific and other sources relied upon for conclusions

3    in the statement.").   These citations simply recognize that certain species *exist* within the

4    affected areas without *any* discussion of species-specific impact on each of these species. *E.g.*

5    GRR 150478 (noting that tufted puffins are a state-listed endangered species occurring in the

6    affected area).

7           The Navy included a statement in the FEIS that a certain bird—pigeon guillemots—has

8    the ability to regenerate from hearing damage and then concluded that the impact on *all* species

9    would be minor.  Dkt. 103, at 24.  First, regenerated hearing from damage caused by engine

10   noise can hardly be considered "minor."  Second, studies about pigeon guillemots are not a

11   reasonable basis from which to draw conclusions about all other species, where the FEIS

12   repeatedly emphasizes that reactions are species-specific.

13          Again, the FEIS is not meant to "sweep[] negative evidence under the rug."  *See Nat'l*

14   *Audubon Soc'y*, 422 F.3d at 194.  Having concluded that species would react differently, the

15   Navy could not simply fly to the conclusion that such reactions would be minor.

16          The Court agrees with the State that *National Audubon Society v. Department of the*

17   *Navy*, 422 F.3d 174 (4th Cir. 2005), provides persuasive guidance on this point.  In that case, the

18   EIS was inadequate where the Navy summarized scientific literature in a "cursory" fashion,

19   concluding that impacts would be "minor"—all while repeatedly contending that impacts would

20   be species-specific.  *Id.* at 192–93.  As here, the use of studies about other species had limited

21   value where the Navy had made its position quite clear that aircraft activity had species-specific

22   effects.  *See id.* at 193.

23

24

1      In conclusion, the bird impact analysis in the FEIS is fundamentally flawed due to the

2 incomplete and arbitrary consideration of species-specific impacts.

3                **E.  El Centro Alternative**

4      COER argues that the Navy arbitrarily and capriciously dismissed the alternative of

5 moving Growler operations to El Centro, California, without engaging in a detailed study of this

6 alternative.  Dkt. 87, at 13.  Although the Court acknowledges that this issue is something of a

7 close call, the Court concludes that the Navy failed to take a "hard look" at the alternative of

8 moving operations to California and that the Navy's rationale for rejecting the El Centro

9 alternative was arbitrary and capricious.

10      Former 40 C.F.R. § 1502.14 (eff. to Sept. 13, 2020) explained that consideration of

11 alternatives is "the heart of the environmental impact statement."  The EIS must "[r]igorously

12 explore and objectively evaluate all reasonable alternatives."  Former 40 C.F.R. § 1502.14(a).

13 Alternatives may be eliminated from detailed study, but the EIS must briefly discuss the reasons

14 for eliminating the alternative.  Former 40 C.F.R. § 1502.14(a).  Similarly, the Ninth Circuit has

15 explained that an agency need not discuss every alternative and may omit discussion of

16 alternatives that are "infeasible, ineffective, or inconsistent with the basic policy objectives for

17 the management of the area."  *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir.

18 2006) (internal quotation marks and citations omitted).  "A 'viable but unexamined alternative

19 renders [the] environmental impact statement inadequate.'"  *Muckleshoot Indian Tribe v. U.S.*

20 *Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999) (internal citation omitted).

21      The FEIS briefly discussed the option of relocating Growler operations and concluded

22 that "[n]o installation exists that could absorb the entire Growler community without excessive

23 cost and major new construction.  Furthermore, moving all Growler squadrons to another

24

1   installation would only move the potential environmental impacts from one community to

2   another community." GRR 150307.  These rationales are not adequate to justify the Navy's

3   rejection of the El Centro alternative.

4          Beginning with the latter rationale, the observation that shifting Growler operations

5   would move environmental impacts is an arbitrary reason to reject detailed consideration of an

6   alternative.  This is always the case when considering an alternative location.  The point of

7   detailed analysis of alternatives is to generate information so that the "most intelligent, optimally

8   beneficial decision will ultimately be made." *N. Alaska Env't Ctr.*, 457 F.3d at 978 (internal

9   quotation marks and citation omitted).  Rejecting an alternative out of hand because it would

10  merely shift environmental consequences is arbitrary and capricious and contrary to the purpose

11  of NEPA and related regulations.

12         As to the cost of relocation, the cost of moving the entire Growler operation to El Centro

13  would undoubtedly be expensive.  And the specter of increased cost and new construction

14  pervades the Navy's analysis related to the El Centro location.  *See* GRR 150308.  The Navy

15  stated that upgrading the "austere" El Centro facility would require over $800 million and the

16  "continued resolve of Congress to support special appropriations and authorizations to replace

17  facilities and training ranges that already exist" at NASWI.  GRR 150308.  But the prospect of

18  increased cost or obtaining appropriations should be considered as part of the detailed objective

19  evaluation of alternative sites—not cited as the basis for a cursory rejection of an alternative.

20  "Guidance from the Council on Environmental Quality," which is a "persuasive authority

21  offering interpretive guidance" regarding the meaning of NEPA and the implementing

22  regulations (*New Mexico v. Bureau of Land Mgmt.*, 565 F.3d 683, 705 n.25 (10th Cir. 2009)

23  (internal quotation marks and citation omitted)), explains that "[a]lternatives that are outside the

24

1    scope of what Congress has approved or funded must still be evaluated in the EIS if they are

2    reasonable, because the EIS may serve as the basis for modifying the Congressional approval or

3    funding in light of NEPA's goals and policies."  Forty Most Asked Questions Concerning CEQ's

4    National Environmental Policy Act Regulations, 46 FR 18026-01, 18027, 1981 WL 149008

5    (1981).  Indeed, the Ninth Circuit has criticized an agency for rejecting an alternative out of hand

6    without considering whether it could request the appropriation of funds.  *See Muckleshoot Indian*

7    *Tribe*, 177 F.3d at 814.  Troublingly, the Navy appears to have given detailed consideration to

8    the prospect of upgrading the El Centro facility in another EIS related to different aircraft

9    operations, despite the increased cost and construction required, yet failed to give such detailed

10   consideration to El Centro in connection with the Growler operations increase at issue here.  *See*

11   GRR 150308.  For these reasons, the Court concludes that the cost rationale that the Navy cited

12   without a more thorough analysis was an arbitrary basis to reject the El Centro alternative.

13          The FEIS also asserts that El Centro is "an indispensable asset for rotary-wing and

14   undergraduate training squadrons as well as the Navy Flight Demonstration Squadron[,] all of

15   whom depend on El Centro's current capabilities and continued availability."  GRR 150308.

16   And the FEIS asserts that adding additional aircraft and construction would aggravate El

17   Centro's "Clean Air Act nonattainment area" status and make it more difficult for California to

18   comply with air quality standards.  GRR 150308.  But these are not reasons that El Centro is, on

19   its face, unfeasible or to reject El Centro out of hand.  These are reasons to engage in a more

20   detailed consideration of the costs and benefits of moving Growler aircraft to El Centro.  Again,

21   these were arbitrary and capricious reasons to reject more detailed consideration of the El Centro

22   alternative.

23

24

1   The FEIS also generally rejected "[s]plit-siting" Growler squadrons between different

2   locations.  GRR 150307.  However, COER does not argue that Growlers should be split, but that

3   the Navy failed to adequately consider relocating the entire Growler operation to the El Centro,

4   California, location.  Dkt. 99, at 7.

5       For the reasons discussed above, the FEIS violates NEPA.  Turning to the remainder of

6   plaintiffs' arguments, the Court finds that plaintiffs have not otherwise shown that the Navy

7   violated NEPA or the NHPA, for the reasons set forth below.

8               **F.  Issues with Noise Analysis in the FEIS**

9       Probably, by far, the most challenged portion of the FEIS was the analysis of noise levels

10  that increased operations would cause.  And, probably because it was most closely scrutinized by

11  everyone, it is also the analysis that survives this Court's review under NEPA.  COER and the

12  State raise a variety of issues, including challenging the Navy's choice not to validate noise

13  estimates from "NOISEMAP" software with real-world measurements, to use an annual average

14  for noise levels, to use a 65 dB DNL average threshold, and not to address in detail whether to

15  use real-world noise measurements as mitigation.  Dkt. 87, at 17, 23.  The Court disagrees that

16  plaintiffs have shown that the FEIS violated NEPA in these regards.

17          **1.  Real World Measurements Were Not Required for a "Hard Look"**

18      Plaintiffs take issue with the Navy's decision to use results from noise-modelling

19  software without taking real-world measurements.  They emphasize that Growler flights were

20  ongoing during the EIS process, so that it would have been relatively easy for the Navy to take

21  real-world measurements at NASWI, and that multiple agencies called on the Navy to do so.  *See*

22  Dkt. 87, at 18–19.

23

24

1    In general, NEPA does not require an agency to use a particular methodology for

2    estimating the impacts of proposed alternatives in a FEIS.  Indeed, "[a] court generally must be

3    'at its most deferential' when reviewing scientific judgments and technical analyses within the

4    agency's expertise."  *N. Plains Res. Council, Inc.*, 668 F.3d at 1075 (internal citation omitted).

5    An EIS must contain "high quality" information and "[a]ccurate scientific

6    analysis."  Former 40 C.F.R. § 1500.1(b) (eff. to Sept. 13, 2020); *Ctr. for Biological*

7    *Diversity*, 349 F.3d at 1167.  This requires an agency to ensure "the professional integrity,

8    including scientific integrity, of the discussions and analyses in environmental impact

9    statements."  Former 40 C.F.R. § 1502.24 (eff. to Sept. 13, 2020).  To take the required "hard

10   look" at a proposed project's effects, the Navy may not rely on incorrect assumptions or data in

11   an EIS.  Former 40 C.F.R. § 1500.1(b) ("Accurate scientific analysis, expert agency comments,

12   and public scrutiny are essential to implementing NEPA."); *Native Ecosystems Council v. U.S.*

13   *Forest Serv.*, 418 F.3d 953, 964–65 (9th Cir. 2005).  However, the Court need not decide

14   whether the FEIS is based on the "best scientific methodology available, nor does NEPA require

15   [a court] to resolve disagreements among various scientists as to methodology."  *Greenpeace*

16   *Action v. Franklin*, 14 F.3d 1324, 1333 (9th Cir. 1992) (internal quotation marks and citation

17   omitted).  A mere difference in opinion or disagreement with a conclusion is insufficient to

18   overturn agency action.  *Id.*

19   Plaintiffs point out that, as the Navy acknowledged, modeled flight tracks were

20   inaccurate because real-world flights deviated from flight tracks based on variables such as

21   weather and pilot proficiency.  *See* Dkt. 87, at 18; *see also* GRR 150262, 150357.  Plaintiffs

22   assert that the use of noise modelling software without real world validation leads to inaccurate

23   results.  However, the Court disagrees that the acknowledged inaccuracies of noise validation

24

1   software render its use arbitrary and capricious or show that the Navy otherwise failed to comply

2   with NEPA.  The point of the noise modelling software is comparison of alternatives.  So long as

3   a common tool is used to estimate noise, the differences will occur for each alternative.  As

4   another District Court concluded when addressing a similar argument:

5           The important point for determining whether the FEIS was arbitrary and capricious
            is that the same methodology was used at each airfield, allowing the same variables
6           to occur at each location.   NEPA does not impose a requirement that the
            environmental impact analysis be perfect, only that the decisionmaker has
7           sufficient information to accurately compare the environmental effects of the
            various alternatives.  [Citation omitted.]  Here, by using the same methodology to
8           arrive at the noise contours at each air station, and recognizing that there are
            uncontrollable variables that will not allow the actual contours to mirror the ideal,
9           the FEIS properly represented the relative impact of increased noise on the
            populations surrounding the three air stations.

10

11   *Citizens Concerned About Jet Noise, Inc. v. Dalton*, 48 F. Supp. 2d 582, 595–96 (E.D. Va.

12   1999), *aff'd*, 217 F.3d 838 (4th Cir. 2000).

13          Plaintiffs also argue that National Park Service ("NPS") measurements and

14   measurements from their expert, Jerry Lilly, showed that the noise modelling software was

15   inaccurate, so that it was arbitrary and capricious for the Navy to continue using the noise

16   modelling software.  *See* Dkt. 87, at 19.

17          But the Navy discussed the NPS measurements at length, ultimately concluding that

18   although the Navy had "some concerns" with respect to NPS' methodology, the NPS

19   measurements were "consistent with the Navy's modeled noise data presented in the EIS."  GRR

20   150260.  The Navy added data points to the noise analysis, including two that corresponded with

21   NPS measurement points, and found that the differences between NPS measurements and noise

22   study results for those points were relatively small.  GRR 150263.  The Navy also discussed the

23   Lilly report that plaintiffs cited, concluding that it contained "several methodological errors,"

24

1    including relying on a snapshot of measurements instead of measurements taken over an

2    extended period of time.  GRR 150267.  However, the Navy concluded that Lilly's single-event

3    sound levels "align[ed] with those computed in the EIS" and otherwise responded to points that

4    Lilly raised regarding the appropriate measure for annoyance caused by aircraft operations.  *See*

5    GRR 150267–68.

6           The Court has evaluated COER's disagreement with the Navy's decision not to use real

7    world validation but does not agree that this decision violated NEPA.  The Ninth Circuit has

8    affirmed the use of modelled predictions rather than real world measurements in a similar

9    situation.  *See Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1108 (9th Cir. 2016)

10   (noting that the modelled data was based on real-world inputs, as is the case here); *see also*

11   *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755,

12   764 (9th Cir. 2014) ("[S]o long as an agency considers all relevant data, it may rely on that

13   available evidence even when it is imperfect, weak, and not necessarily dispositive.").  COER

14   argues that *Idaho Wool Growers Association* is distinguishable because that case did not involve

15   a challenge to the particular application of the model, but the Court disagrees.  *See* Dkt. 87, at 21

16   n. 12.  *Idaho Wool Growers Association* was similarly a challenge to the use of a model

17   predicated on actual data but not validated with real world measurements at the location in

18   question.  *See* 816 F.3d at 1108–09.  Here, the FEIS includes explanation of how NOISEMAP

19   software is generally considered the "approved" program for noise impact assessment, "validated

20   as an accurate process through many years of use by the [Department of Defense]."  *See* GRR

21   150241.

22          COER also takes issue with the Navy's alleged failure to respond to its comments calling

23   for real world monitoring and to disclose the issues with using NOISEMAP software.  *See* Dkt.

24

1    87, at 17, 21–23.  The Court disagrees with COER's arguments in this regard, as well.  The Navy

2    complied with former 40 C.F.R. § 1502.22(a) by explaining why it did not conclude that real-

3    world validation was "essential to a reasoned choice among alternatives."  The Navy disclosed

4    its use of the NOISEMAP model and explained why it would not be using noise monitoring, in

5    response to NPS, COER, and others' comments.  *See* GRR 150241, 150333, 150343.  NEPA

6    does not require more.  *Compare Idaho Wool Growers Ass'n*, 816 F.3d at 1109 ("Most

7    importantly, the [agency] clearly explained the assumptions on which it built the model and the

8    uncertainties inherent in it, thereby identifying the model's limitations. . . .  Those explanations

9    and acknowledgments are all that NEPA requires."), *with Lands Council*, 395 F.3d at 1032

10   (explaining that where an agency knew that its methodology had shortcomings, and yet did not

11   disclose these shortcomings, the agency's withholding of information violated NEPA).

12                **2.  Use of Annual Average DNL Did Not Violate NEPA**

13           COER next argues that the Navy's use of an annual average DNL ("day-night average

14   sound level") violated the NEPA because that metric misled regarding the impact of increased

15   Growler operations.  Dkt. 87, at 23.  The Court disagrees, although the Court acknowledges that

16   this issue is a close call.

17           COER proposes the use of averages of busy days (and quiet days), so that the relative

18   change in the average noise on those days can be compared.  *See* Dkt. 87, at 24.  It should be

19   noted that the Growler operation at OLF Coupeville is somewhat unique because there are

20   extended periods of time where the Growlers are not practicing take offs and landings—during

21   those times Whidbey Island remains a quiet refuge.  But when the Growlers practice, it is

22   extremely loud.  Thus, averaging the quiet days with the extremely loud days would, at first

23   blush, seem to gloss over the impact of the operation.

24

1        Nevertheless, in cases involving challenges to annual average noise calculations, courts

2   have routinely affirmed the use of average sound levels that do not isolate busy days when

3   estimating aircraft noise.  *E.g.*, *Valley Citizens for a Safe Env't v. Aldridge*, 886 F.2d 458, 468–

4   69 (1st Cir. 1989) (rejecting challenges to average DNL methodology on the basis that it failed to

5   account for how annoying busy days were); *see Morongo Band of Mission Indians v. F.A.A.*, 161

6   F.3d 569, 579 (9th Cir. 1998) (upholding the use of an average metric rather than focusing on

7   single events); *Communities, Inc. v. Busey*, 956 F.2d 619, 624 (6th Cir. 1992) (similar); *Sierra*

8   *Club v. U.S. Dep't of Transp.*, 753 F.2d 120, 128 (D.C. Cir. 1985) (similar); *Citizens Concerned*

9   *About Jet Noise, Inc. v. Dalton*, 48 F. Supp. 2d 582, 596 (E.D. Va. 1999) (similar).

10       The Court is constrained to reach a similar conclusion here.  The Navy did not arbitrarily

11  or capriciously choose the annual average metric.  The Navy explained in detail why it preferred

12  the annual metric that it used.  The Navy stated, for instance, that the annual average DNL is the

13  "standard noise metric used as a federal standard for measuring noise impacts" "supported by

14  guidance from the Federal Aviation Administration[,] U.S. [EPA,] Department of Defense[,]"

15  and other bodies.  GRR 161318.  The use of another measure would create results that "would

16  not be applicable to the established guidelines . . . and could not be applied directly."  GRR

17  161318.  Further, the annual average accounted for the benefit of quiet days.  GRR 161318–19.

18  The Navy also reasoned that using the "average busy day" metric was "highly conservative,"

19  could "result in overstated noise impacts," and had been eliminated from various programs due

20  to potential for inaccuracy.  GRR 150329.

21       COER takes issue with all this rationale, arguing that a common measure could have

22  been used between Ault Field and OLF Coupeville and that its own metric would better highlight

23  convey the impact of the increased operations.  This is not enough to show that the Navy acted

24

1   arbitrarily and capriciously.  Notably, although COER makes much of another Navy document

2   stating that at "some military bases, where operations are not necessarily consistent from day to

3   day, a common practice is to" use the busy day comparison to avoid dilution "by periods of low

4   activity" (*see* Dkt. 87, at 25), this fails to account for the Navy's stated concern of using a

5   common measure.  Ault Field (the main NASWI airfield) is described throughout the FEIS as far

6   busier than OLF Coupeville (*e.g.*, GRR 150303), so that a metric best suited for intermittently

7   used, less busy airfields would have its own drawbacks when applied to Ault Field.

8         COER argues that the annual average DNL does not convey how many more days

9   Growlers will be flying and how much louder days of activity will be.  Dkt. 87, at 23.  Regarding

10  the former issue, however, the FEIS clearly discloses that there will be an increase in operations

11  at OLF Coupeville.  *See* GRR 159155.  Regarding the latter issue, COER's argument is

12  essentially that the annual average is misleading where operations are intermittent.  But as the

13  Navy points out, COER's metric can itself mislead:  for instance, "if an airfield doubles

14  operations but also doubles its flying days, the resulting DNL will not change with all else being

15  equal."  GRR 161319.  Indeed, the Navy concluded that use of the busy day metric would result

16  in misleading statistics because the proposed change at OLF Coupeville was primarily an

17  increase in flying days, so that the use of a "busy day" DNL would "risk misleading the public

18  because the proposed conditions would prove identical to existing conditions."  GRR 150254.

19  So, in summary, no method appears to be perfect.  Both methods have their advantages and

20  disadvantages.  The Court is not in a position to choose which method should be used.  The Navy

21  has chosen, and its choice is not arbitrary and capricious.

22        The Court observes that plaintiffs have pointed to a 2016 email in the record indicating

23  that the Navy refused to provide a specific number of fly days because this would support

1   COER's case for using the "average busy day" metric.  GRR 93857.  Although it could be

2   argued that the Navy is considering the value of the lamppost for support, rather than the light,

3   NEPA constrains the Court to evaluate whether the reasoning set forth in the FEIS complies with

4   NEPA and the APA, not to inquire into the Navy's subjective motivations.  *See Hawaii Cty.*

5   *Green Party v. Clinton*, 124 F. Supp. 2d 1173, 1196 (D. Haw. 2000) ("NEPA does not require

6   agencies to be subjectively impartial.").  Having concluded that the Navy's rationale for

7   foregoing the annual busy day metric was not arbitrary and capricious, the Court declines to

8   address this issue further.

9                    **3.  Use of the 65 dB Threshold Did Not Violate NEPA**

10          COER argues that the Navy arbitrarily and capriciously used an out-of-date 65 dB DNL

11   threshold when more recent studies indicate that a 55 dB DNL threshold best captures the effect

12   of loud noise on people.  Dkt. 87, at 30.

13          "A hard look should involve a discussion of adverse impacts that does not improperly

14   minimize negative side effects."  *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1159

15   (9th Cir. 2006), *abrogated on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7

16   (2008).

17          "[A]gencies are permitted to determine a threshold of significance for noise impacts."

18   *Save Strawberry Canyon v. U.S. Dep't of Energy*, 830 F. Supp. 2d 737, 749 (N.D. Cal. 2011).

19   And the use of a 65 dB threshold is "well-established."  *See Town of Cave Creek, Ariz. v. F.A.A.*,

20   325 F.3d 320, 326 (D.C. Cir. 2003) (citing authorities); *see also Morongo Band of Mission*

21   *Indians*, 161 F.3d at 578 (holding that appellants failed to establish that FAA methodology

22   requiring a 65 dB threshold was arbitrary or capricious).  As noted above, it is not for this Court

23

24

1   to engage in a "battle of the experts" between plaintiffs and the Navy or to substitute the Court's

2   own judgment for that of the Navy regarding the appropriate threshold.

3        Here, the Navy stated it would use the 65 dB threshold because it was consistent with the

4   FAA and other Department of Defense services.  GRR 150254.  The Navy acknowledged that

5   public comments challenged the use of the 65 dB threshold (*see* GRR 150252–53) but ultimately

6   concluded that it would use the 65 dB threshold, anyway, as that threshold was consistent with

7   federal usage.  GRR 150253–55.

8        Citing *Seattle Audubon Society v. Espy*, 998 F.2d 699 (9th Cir. 1993), COER argues that

9   even if the Navy had a "valid reason for not using the updated" threshold, "it needed to explain

10  itself."  Dkt. 87, at 33.  But *Seattle Audubon Society* holds that even if an agency concludes that

11  it "need not undertake further scientific study" in response to criticisms of the agency's

12  methodology, the agency "must explain in the EIS why such an undertaking is not necessary or

13  feasible."  998 F.2d 699, 704 (9th Cir. 1993).  The Navy did this.  The Navy responded to

14  criticism of its use of the 65 dB DNL threshold and explained why it would not use a 55 dB

15  threshold.  NEPA does not require more.  *See Morongo Band of Mission Indians*, 161 F.3d at

16  578.

17       Finally, to the extent that COER relies on recent congressional findings about the 65 dB

18  DNL threshold, the Court must confine its analysis to whether the 65 dB DNL threshold was

19  appropriate at the time of the FEIS, not after the fact.  *See, e.g.*, *Theodore Roosevelt*

20  *Conservation P'ship v. Salazar*, 616 F.3d 497, 511 (D.C. Cir. 2010).

21       Based on the above, the Court declines to find that the Navy's use of the 65 dB threshold

22  was arbitrary and capricious.

23                **4.  The FEIS Did Not Need to Address Noise Monitoring as Mitigation**

24

1    COER argues that the Navy failed to consider noise monitoring as a mitigation measure,

2    violating the Navy's NEPA obligations to respond to comments on the draft EIS and to include a

3    discussion of reasonable mitigation measures.  Dkt. 87, at 34.  The Court disagrees.

4        "Pursuant to NEPA, an agency must also consider appropriate mitigation measures that

5    would reduce the environmental impact of the proposed action."  *Protect Our Communities*

6    *Found. v. Jewell*, 825 F.3d 571, 581 (9th Cir. 2016) (citing 42 U.S.C. § 4332(2)(C)(ii)).  "[T]he

7    agency must provide an assessment of whether the proposed mitigation measures can be

8    effective . . . [and] whether anticipated environmental impacts can be avoided."  *Id.* (internal

9    quotation marks and citation omitted).

10        NEPA does not require that an agency adopt a particular mitigation measure.  *Pac. Coast*

11   *Fed'n of Fishermen's Associations v. Blank*, 693 F.3d 1084, 1104 n.16 (9th Cir. 2012).  The

12   FEIS must merely contain a "reasonably complete discussion of potential mitigation measures."

13   *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 528 (9th Cir. 1994), *as amended*

14   *on denial of reh'g* (Dec. 20, 1994).

15        The FEIS's mitigation discussion does not discuss ongoing noise monitoring as a

16   mitigation measure.  *See, e.g.*, GRR 160888–906 (appendix of noise mitigation efforts).  But the

17   Navy explained in response to public comment that it was not considering noise monitoring

18   because noise monitoring "would not change the results[.]"  GRR 161320.  It is reasonable to

19   conclude that mitigation would not reduce the environmental impact of the operation but would

20   merely measure it.  The Navy included a detailed discussion of other mitigation measures related

21   to excess noise.  *See* GRR 160888–906.

22        Nor does the Court agree that the Navy failed to provide a meaningful response to

23   comments calling for noise monitoring as mitigation.   As noted above, the Navy's response to

24

1   comments included an explanation of why it rejected ongoing noise monitoring.  *See* GRR

2   161320.  Furthermore, the Navy validly concluded that the NOISEMAP modelling software did

3   not need to be validated with real-world measurements.  *See supra*, part II(F)(1).  Plaintiffs fail

4   to show that the Navy violated NEPA by providing a greater explanation of why real-world noise

5   monitoring would not be considered as a mitigation measure.

6           **G.  Non-Auditory Impacts**

7           The State argues that the Navy failed to take a "hard look" at non-auditory health

8   impacts.  *See* Dkt. 88, at 21.  The Court disagrees.

9           In the FEIS, the Navy repeatedly concluded that there was no definite relationship

10   between aircraft noise and non-auditory health impacts.  For instance, the Navy concluded that

11   although brief exposure to noise could result in short-lived physiological effects, there was not a

12   clear connection between repeated exposure and long-term effects.  *See* GRR 150339.  The Navy

13   summarized studies in support of this conclusion, finding that "[t]he results of most cited studies

14   are inconclusive."  GRR 150339; *see also* GRR 150753 (conclusions regarding children),

15   150695.

16           As noted above, where there is insufficient information for reasonable forecasting, the

17   agency must make clear that the information is lacking.  Former 40 C.F.R. § 1502.22.  And

18   generally, if available literature is inadequate to link increased noise levels to quantifiable

19   impacts on non-auditory health, the Court agrees with the Navy that it is not required to measure

20   or attempt to forecast such impacts in the FEIS.  *See Off-Rd. Bus. Ass'n.*, 2006 WL 8455349, at

21   *4.

22           The State takes issue with the Navy's citation of a Department of Defense bulletin that

23   has nothing to do with non-auditory health.  *See* GRR 150339 (citing "DNWG, 2013"); *see also*

24

1    GRR 56299.  However, even setting aside the references to this bulletin, the FEIS contains

2    adequate analysis of nonauditory health impacts to constitute a "hard look."  *See, e.g.*, GRR

3    150339–40.  The State also challenges the Navy's alleged failure to rely on certain 2011 and

4    2013 studies regarding non-auditory health.  Dkt. 88, at 23.  But the Navy did look at these

5    documents and rejected them because one was "not a study," and relied on an unused

6    methodology, and the other study failed to control for other variables.  *See* GRR 159314–15,

7    159658.

8            Similarly, regarding children's health, the State asserts that the Navy arbitrarily dismissed

9    impacts to child health due to the intermittent nature of aircraft noise.  But the Navy also referred

10   to its conclusion that there was "no proven positive correlation between noise-related events and

11   physiological changes in children."  GRR 150753.  And the Navy discussed German studies that

12   the Navy concluded supported its conclusion that overall, the specific cause and effect

13   relationship between noise and health factors was not understood.  *See* GRR 150753.  Notably,

14   the FEIS includes an extensive discussion of various studies, including that there were no

15   "unequivocal conclusions" that could be drawn about the relationship between aircraft noise

16   exposure and blood pressure.  *See* GRR 159324.

17           In sum, the State fails to show that the Navy did not take a "hard look" at nonauditory

18   health impacts.  The Navy responded to criticisms of its discussion of nonauditory health impacts

19   by considering an additional 260 published articles, including those recommended by the State.

20   *See* GRR 150256.  Moreover, although the State argues that the Navy violated former 40 C.F.R.

21   § 1502.22(a), the Navy's discussion of scientific literature amounted to an explanation of why it

22   did not believe that additional information about non-auditory health impacts was "essential" to a

23

24

1    reasoned choice among alternatives.  The Navy's explanation in this regard also complied with

2    the requirement that it provide a statement pursuant to former 40 C.F.R. § 1502.22(b).

3    **III.  NHPA Arguments**

4        Because the Growler expansion impacted historic properties on Whidbey Island, the

5    Navy had to comply with the National Historic Preservation Act ("NHPA"), which generally

6    requires consultation with and solicitation of comments from state and other interested parties.

7    Plaintiffs argue that the Record of Decision violated section 106 of the NHPA.  *See* Dkt 87, at

8    41; Dkt. 88, at 37.  The Court disagrees for the reasons set forth below.

9        **A.  Legal Standard**

10       Section 106 of the NHPA requires the Navy to "take into account the effect of [a

11   proposed Federal] undertaking on any historic property" and to afford the Advisory Council on

12   Historic Preservation ("ACHP") a reasonable opportunity to comment on such an undertaking.

13   54 U.S.C. § 306108; *see also* 36 C.F.R. § 800.1.  An agency official must identify the property

14   that is eligible for listing on the National Register of Historic Places and that would be affected

15   by the undertaking, determine if the affect is adverse, and, if so, consult with the State Historic

16   Preservation Officer ("SHPO") and other appropriate parties to develop alternatives to mitigate

17   any adverse effects on historic properties.  *See Tyler v. Cuomo*, 236 F.3d 1124, 1128 (9th Cir.

18   2000); *see also* 36 C.F.R. §§ 800.4, 800.5.

19       "Like NEPA, '[s]ection 106 of NHPA is a stop, look, and listen provision that requires

20   each federal agency to consider the effects of its programs.'"  *Te-Moak Tribe of W. Shoshone of*

21   *Nevada v. U.S. Dep't of Interior*, 608 F.3d 592, 607 (9th Cir. 2010) (quoting *Muckleshoot Indian*

22   *Tribe*, 177 F.3d at 805); *cf. United States v. 0.95 Acres of Land*, 994 F.2d 696, 698 (9th Cir.

23

24

1    1993) ("NHPA is similar to NEPA except that it requires consideration of historic sites, rather

2    than the environment.").

3           Like other actions under the APA, judicial review of actions under the NHPA is limited

4    to whether the agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise

5    contrary to law.  *See Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006).

6                                    **B.  Discussion**

7           Here, the Navy began consultation with the Washington SHPO, the ACHP, and other

8    interested parties in October 2014.  GRR 167574.  In June 2018, the Navy released its

9    determination of adverse effects.  GRR 167574.  The SHPO and the Navy could not reach an

10   agreement regarding mitigation of adverse indirect effects, and the Navy terminated consultation

11   in November 2018.  GRR 167575.

12          The Navy may terminate consultation with the SHPO if the Navy determines "that further

13   consultation will not be productive[.]"  36 C.F.R. § 800.7(a).  The Navy must then "request that

14   the [ACHP] comment pursuant to [36 C.F.R. § 800.7(c)] and shall notify all consulting parties of

15   the request."  36 C.F.R. § 800.7(a)(1).

16          In this matter, after terminating consultation with the SHPO and others, the Navy sought

17   comments from the ACHP.  GRR 164171.  In response, the ACHP made a number of

18   recommendations, including, (1) working with stakeholders to undertake additional monitoring;

19   (2) committing to working with stakeholders to develop mitigation measures based on the results

20   of the monitoring; (3) pursuing additional noise minimization measures and noise reducing

21   technologies.  *See* GRR 167463–65.  The ACHP specifically recommended that the Navy

22   consider a "broader range" of funding for the long-term preservation of the Central Whidbey

23   Island Historic District than simply rehabilitating the Ferry House.  GRR 167464.

24

1    The Navy must "take into account the [ACHP's] comments in reaching a final decision

2  on the undertaking," which documentation must include preparing "a summary of the decision

3  that contains the rationale for the decision and evidence of consideration of the [ACHP's]

4  comments," providing the summary to the ACHP and all consulting parties, and notifying the

5  public and making the record available for public inspection.  36 C.F.R. § 800.7(c)(4).

6    In response to the ACHP comments, the Navy (1) declined to undertake additional noise

7  monitoring efforts; (2) honored its previous offer to fund Ferry House preservation projects,

8  offered funds for historical signs, but declined to carry out mitigation measures other than those

9  in the Navy's previous offer; and (3) adhered to noise mitigation measures set forth previously

10  (including Precision Landing Mode and research on chevron seals) but declined to implement a

11  recommended sound insultation program.  *See* GRR 167576–77.  The Navy also stated that it

12  would seek other partnership opportunities under the federal Readiness and Environmental

13  Protection Integration Program and Sentinel Landscapes Program.  GRR 167576.

14    The State argues that the Navy failed to provide a rational explanation of why the Navy

15  chose to reject the ACHP's recommended mitigation measures in favor of lesser measures.  Dkt.

16  88, at 38.  Rather, the State asserts that the Navy merely listed mitigation measures without

17  providing a "rationale for the decision" to reject greater mitigation measures.  *See* 30 C.F.R. §

18  800.7(c)(4)(i).  COER similarly argues that the Navy gave arbitrary rationale for rejecting the

19  ACHP's comments.  Dkt. 87, at 39.

20    Again, the NHPA does not require that the Navy adopt the ACHP's comments.  Instead,

21  the Navy must "demonstrate that it has read and considered those recommendations."

22  *Concerned Citizens All., Inc. v. Slater*, 176 F.3d 686, 696 (3d Cir. 1999).  Here, the Navy's

23  response meets the requirement of demonstrating that it read and considered the ACHP's

24

1    recommendations.  Moreover, the Navy's rationale does not demonstrate that it arbitrarily and

2    capriciously rejected the ACHP's recommendations, many of which the Navy incorporated.

3         First, regarding ongoing real-world monitoring, the Navy declined to implement

4    additional monitoring and stated that it was using noise modeling, which the Navy concluded

5    was consistent with NPS measurements.  GRR 167575.

6         The ACHP had recommended that the Navy be open to provide funding for more than

7    just rehabilitation efforts at the Ferry House, and the Navy committed to $867,000 for Ferry

8    House preservation projects as well $20,000 for interpretive historical signs at appropriate

9    locations.  GRR 167576.  The Navy also agreed to the recommendation of exploring partnerships

10   with a Department of Defense office for long-term preservation of the historic district.  GRR

11   167576.  However, the Navy declined to "examine other creative means of funding and carrying

12   out" mitigation measures in light of its ability to fund the Ferry House.  GRR 167576.

13        Also, the Navy adopted a recommendation to seek partnership opportunities and

14   collaboration with stakeholders related to the Readiness and Environmental Protection

15   Integration program and designating historic landscapes as Sentinel Landscapes.  GRR 167576.

16        Regarding the ACHP's recommendation to identify potential changes to reduce noise, the

17   Navy declined to adopt the referenced sound insulation program as the funds were not available

18   to the Navy.  However, the Navy explained that it had already committed to employing the

19   Precision Landing Mode technology (reducing proposed aircraft operations under the preferred

20   alternative), remained committed to implementing other measures identified in the FEIS, and had

21   recently appropriated funds to research chevron seals, a potential noise-reducing technology.

22   GRR 167577.

23

24

1        The State asserts that these responses were inadequate because the Navy did not explain

2   why it focused only on the Ferry House, despite acknowledging that the Ferry House alone was

3   not impacted by noise, and because "signage" is not a noise mitigation measure.  Dkt.101, at 34.

4   However, the Navy points out that it agreed to fund signage in the area, not just to fund the Ferry

5   House.  Moreover, the Navy argues that this was appropriately targeted toward the Navy's

6   previously identified adverse effect on the "perceptual qualities of the five locations that

7   contribute to the significance of the landscapes."  *See* GRR 167460.

8        Thus, plaintiffs fail to show that the Navy acted arbitrarily or capriciously because they

9   have not shown that the Navy ignored the adverse effects of increased jet noise on the relevant

10  areas.

11  **IV.  Remaining Claims and Issues**

12        Plaintiffs have not come forward with argument or evidence to support their remaining

13  claims.  *See* Dkt. 16, at 35–36, 2:19-cv-01062-RAJ-JRC (asserting claims under the

14  Environmental Species Act ("ESA")).  Accordingly, to the extent that plaintiffs raise claims

15  under the ESA, those claims should be dismissed with prejudice.

16  **V.  Remedy**

17        The parties have chosen not to address the issue of remedy in their cross-summary

18  judgment motions.  Accordingly, the Court recommends that the District Court order the parties

19  to confer and provide a joint statement regarding an appropriate remedy for the violations of

20  NEPA noted herein within 30 days from the date of the District Court's order on this Report and

21  Recommendation.  If the parties cannot reach agreement, they may submit a stipulated briefing

22  schedule, instead.

23

24

1

## CONCLUSION

2 The cross-summary judgment motions should be granted in part and denied in part and

3 the motion for leave to submit extra record evidence is granted.  Dkts. 85, 87, 88, 92.  Plaintiffs

4 are entitled to judgment in their favor on their NEPA claims, inasmuch as they argue that the

5 FEIS and ROD violated NEPA by failing to disclose the basis for greenhouse gas emissions

6 calculations, failing to quantify the impact of increased operations on classroom learning, failing

7 to take a hard look at species-specific impacts on birds, and failing to give detailed consideration

8 to the El Centro, California, alternative.  The remaining NEPA claims and the NHPA claims

9 should be dismissed with prejudice.  The parties should be directed to submit a stipulation

10 regarding the appropriate remedy in this matter or a stipulated briefing schedule within 30 days

11 of the date of the Order on this report and recommendation.

12 Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

13 fourteen (14) days from service of this Report to file written objections.  *See also* Fed. R. Civ. P.

14 6.  Failure to file objections will result in a waiver of those objections for purposes of *de novo*

15 review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a result in a waiver

16 of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Miranda v.*

17 *Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit

18 imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **December 31,**

19 **2021,** as noted in the caption.

20 Dated this 10th day of December, 2021.

21

22

J. Richard Creatura
Chief United States Magistrate Judge

23

24