HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STATE OF WASHINGTON, *et al.*,

        Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
THE NAVY, *et al.*,

        Defendants.

Case No. 19-cv-1059-RAJ

**ORDER ON REMEDY AND
FEDERAL DEFENDANTS'
MOTION FOR LEAVE TO
SUMBIT DOCUMENTS *EX
PARTE***

## I.    Introduction

This matter is before the Court on parties briefing on remedy following the grant of summary judgment on some of Plaintiffs' NEPA claims. Dkt. # 129. The Court will also address Federal Defendants' motion for leave to submit documents *ex parte*. Dkt. # 131. For the reasons below, the Court finds that remand without vacatur is the appropriate remedy and denies Federal Defendants' motion.

## II.    Background

The history of this dispute is detailed more fully in the Court's Report & Recommendation dated December, 10, 2021 and briefly summarized here. Dkt. # 109. Naval Outlying Landing Field Coupeville—or OLF Coupeville—is a military airport

ORDER – 1

located on Whidbey Island in Washington. Operations at OLF Coupeville have been a source of litigation against the Navy since 1992. The residents who own property around OLF Coupeville have regularly complained about the amount of jet noise generated there. *See Argent v. United States*, 124 F.3d 1277, 1279 (Fed. Cir. 1997).

In 2008, the Navy transitioned its aircraft fleet from the "Prowler" aircraft to the "Growler" aircraft. In 2013, Plaintiff COER sued the Navy, claiming it should have prepared an environmental impact statement ("EIS") related to the change. *See COER v. U.S. Dep't of the Navy*, 122 F. Supp. 3d 1068, 1072 (W.D. Wash. 2015). As part of the 2013 lawsuit, the Navy agreed to prepare an EIS regarding its current Growler activities on Whidbey Island, although the Navy stated that it would also evaluate the effects of adding additional Growler aircraft there. *See COER*, 122 F. Supp. 3d at 1076. The Final Environmental Impact Statement ("FEIS") and Record of Decision ("ROD") on the Growler expansion forms the basis for this current dispute.

This Court found the FEIS and ROD on the Growler expansion violated NEPA. Dkt. ## 109, 119. In doing so, the Court concluded that the Navy (i) failed to disclose the basis for its greenhouse gas emissions calculations, (ii) failed to quantify the impact of increased operations on classroom learning, (iii) failed to take a hard look at species-specific impacts on birds, and (iv) failed to give detailed consideration to the El Centro, California, alternative. The Court made specific findings:

*(i)*    *Emissions.* When reporting on the environmental impact of Growler fuel emissions, the Navy underreported the true amount of Growler fuel emissions and failed to disclose that it was not including any emissions for flights above 3,000 feet. Even after receiving a comment on the issue, the Navy failed to disclose its underreporting and dismissed the issue with broad generalities. Dkt. # 109 at 2.

*(ii)*    *Classroom learning.* The Navy acknowledged numerous studies that concluded that aircraft noise would measurably impact learning but then arbitrarily concluded that no further analysis was necessary because it could not quantify exactly

ORDER – 2

how the increased operations would interfere with childhood learning. *Id.*

      *(iii)    Species-specific impacts on birds.* The Navy repeatedly stated that increased jet noise would have species-specific impacts on the many bird species in the affected area but then failed to conduct a species-specific analysis to determine if some species would be more affected than others. Instead, the Navy simply concluded that certain species were not adversely affected and then extrapolated that conclusion to all other species. *Id.* at 3.

      *(iv)    Alternative analysis.* In evaluating reasonable alternatives to the Growler expansion at Whidbey Island, which it was required to do, the Navy rejected moving the Growler operations to El Centro, California out of hand. The Navy summarily concluded that such a move would cost too much and that moving the operation to El Centro would have its own environmental challenges. The Navy's cursory rationale was arbitrary and capricious and did not provide a valid basis to reject the El Centro alternative. *Id.*

      The Court ordered briefing on the appropriate remedy for the NEPA violation, which is analyzed further below. *Id.* at 37.

**III.    Legal Standard**

      The National Environmental Policy Act has "twin aims." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (citation and internal quotation marks omitted). First, it requires a federal agency to "consider every significant aspect of the environmental impact of a proposed action." *Id.* at 97 (citations omitted). Second, it ensures that the agency will "inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Id.* NEPA does not contain substantive environmental standards. Rather, it "establishes 'action-forcing' procedures that require agencies to take a 'hard look' at environmental consequences." *Metcalf v. Daley,* 214 F.3d 1135, 1141 (9th Cir. 2000); *see also Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 348 (1989).

ORDER – 3

NEPA requires federal agencies to prepare an Environmental Impact Statement ("EIS") prior to taking "major Federal actions significantly affecting the quality" of the environment. 42 U.S.C. § 4332(2)(C). Courts review an agency's compliance with NEPA under the Administrative Procedure Act ("APA"). *Id.* Section 706 of the APA provides that a "reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, ... otherwise not in accordance with law[,] ... [or] in excess of statutory jurisdiction, authority, or limitations."

## IV.    Discussion

### A.  Need for ex parte classified documents in the remedy phase

The Federal Defendants move to lodge the classified Declaration of Vice Admiral Kenneth R. Whitesell to explain the need for the current number of training operations at Whidbey Island and OLF Coupeville. Dkt. # 134. "The process of *in camera* review ineluctably places the court in a role that runs contrary to our fundamental principle of a transparent judicial system. It also places on the court a special burden to assure itself that an appropriate balance is struck between protecting national security matters and preserving an open court system." *Al-Haramain Islamic Found., Inc. v. Bush*, 507 F.3d 1190, 1203 (9th Cir. 2007). The Court has already considered how national security could be affected by disrupting Field Carrier Landing Practice (FLCP) exercises and the factors that make Whidbey Island unique for them. *See Washington v. U.S. Dep't of the Navy*, 2020 WL 8678103 at *4-5 (W.D Wash. July 22, 2020). Given the duplicative nature of the information, and the potential prejudice to Plaintiffs, the Court **DENIES** the motion and relies on the unclassified information presented in the remedy briefing.

### B.    Remedy

The presumptive remedy under the APA is vacatur of the FEIS and ROD. *350 Mont. v. Haaland*, 50 F.4th 1254, 1273 (9th Cir. 2022); *see also All. for the Wild Rockies v. U.S. Forest Serv.,* 907 F.3d 1105, 1121-22 (9th Cir. 2018).

ORDER – 4

1    To determine whether vacatur is appropriate, a court is to "weigh the seriousness
2    of the agency's errors against the disruptive consequences of an interim change that may
3    itself be changed." *Nat. Resources Def. Council v. U.S. Envt'l Protec. Agency*, 38 F.4th
4    34, 51 (9th Cir. 2022) (citing *Nat'l Fam. Farm Coal. v. U.S. Envt'l Protec. Agency*, 960
5    F.3d 1120, 1144 (9th Cir. 2020)); *Pollinator Stewardship Council v. U.S. Envt'l. Prot.*
6    *Agency,* 806 F.3d 520, 532 (9th Cir. 2015). In considering the remedy, a court is to
7    examine "whether the agency would likely be able to offer better reasoning [and] . . .
8    adopt the same rule on remand, or whether such fundamental flaws in the agency's
9    decision make it unlikely that the same rule would be adopted on remand." *Nat.*
10   *Resources Def. Council*, 38 F.4th at 52 (quoting *Pollinator Stewardship Council*, 806
11   F.3d at 532).

12   **1.     Seriousness of the agency's error**

13   First, violations that undermine important congressional objectives of the
14   underlying statute are found to be serious. *See, e.g., W. Watersheds Project v. Zinke*, 441
15   F. Supp. 3d 1042, 1083 (D. Idaho 2020) ("The seriousness of deficiencies should be
16   measured by the effect the error has in contravening the purposes of the statutes in
17   question") (cleaned up). The Navy offers that the deficiencies in the FEIS and ROD are
18   not that serious or numerous, and seem certain that it will affirm its decision to expand
19   the Growler program at Whidbey Island upon remand. *See* Dkt. # 135 at 9. The Court
20   disagrees with the Navy's assessment.

21   NEPA is a procedural statute designed to ensure comprehensive consideration of
22   the direct, indirect, and cumulative effects of proposed agency action. *Barnes v. U.S.*
23   *Dep't of Transp*., 655 F.3d 1124, 1136 (9th Cir. 2011); 40 C.F.R. §§ 1508.7–8. That did
24   not occur here. Notably, this Court found that the Navy "selected methods of evaluating
25   data that supported its goal of increasing Growler operations" and "turned a blind eye to
26   data that would not support this intended result." Dkt. # 109 at 2.

27   As noted in the Court's findings, the Navy underreported the true amount of

28   ORDER – 5

Growler fuel emissions and failed to disclose that its model excluded fuel emissions for flights above 3,000 feet to determine environmental impacts. Dkt. # 109 at 3. The Navy also stated that increased noise would have species-specific impacts on many of the bird species in the affected area but then failed to conduct a species-specific analysis to determine if some species would be more affected than others. *Id. The* Navy also summarized literature that included measurable links between aircraft noise and childhood learning, but then declined to conduct similar analysis the degree of impact on child learning caused by the increase in Growler operations. *Id.* Finally, the Navy engaged in a cursory review of an alternative location in violation of NEPA. *Id.*

The failure to conduct these necessary analyses are therefore sufficiently serious violations as they clearly undermine central congressional objectives of NEPA. *See Zinke*, 441 F. Supp. 3d at 1083, 1086-87; *Nat. Res. Defense Council v. E.P.A.*, 489 F.3d 1364, 1374 (D.C. Cir. 2007) ("The agency's errors could not be more serious insofar as it acted unlawfully, which is more than sufficient reason to vacate the rules.").

## 2.     Risk of disruptive consequences

Next, the Court is to consider the extent to which either vacating or leaving the decision in place would risk disruptive consequences. *Nat'l Fam. Farm. Coal*., 960 F.3d at 1144-45. The equities tilt away from vacatur where "the disruptive consequences of an interim change that may itself be changed" are significant, and the factor "is weighty only insofar as the agency may be able to rehabilitate its rationale for the regulation." *Coal. To Protect Puget Sound Habitat v. U.S. Army Corps of Engineers,* 466 F. Supp. 3d 1217, 1224 (W.D. Wash. 2020) (citations and quotations omitted). Courts generally decline to vacate an agency action when doing so would increase the potential for environmental harm. *See Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995). Other relevant considerations include economic and community-level impacts. *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012).

To be sure, there is no guarantee the same rule on remand could reissue.  An EIS

is inadequate where it fails to disclose relevant shortcomings and consideration of relevant variables. *See Lands Council*, 395 F.3d at 1030. As the Court noted above, the Navy's FEIS and ROD fell short in several respects which may need to be fully considered on remand. Therefore, the Court cannot say that once the Navy considers these shortcomings that it will be able to expand the Growler program at OLF Coupeville in the same form, although it is possible. Consequently, "it does not appear 'likely' as opposed to possible" that Navy will produce the same determination on remand. *Cook Inletkeeper v. Raimondo,* 541 F. Supp. 3d 987, 991-92 (D. Alaska 2021); *Pollinator Stewardship Council*, 806 F.3d at 532 (finding vacatur appropriate where "a different result may be reached" on remand).

In looking at the potential disruptive consequences, these are mixed but significant. One the one hand, maintaining the status quo allows for an increase in 25 to 40 percent increase fuel emissions and increased sensory disturbance impacts potential for certain species in the area. GRR 150150-53. The particular significance of those consequences are largely unknown precisely because the Navy – seemingly in an attempt to greenlight the Growler expansion – failed to comply with its statutory obligations to quantify these impacts. Only the forthcoming EIS will clarify the significance of these impacts with an expanded Growler program.

The Navy focuses most of its disruptive consequences argument on the general importance of Growler training operations, specifically FLCPs, to national security. Dkt. # 135-3. However, it well established that NEPA contains no "national security" or "defense" exception. *See, e.g.*, *San Luis Obispo Mothers for Peace v. NRC*, 449 F.3d 1016, 1035 (9th Cir. 2006) ("There is no 'national defense' exception to NEPA .... The Navy, just like any federal agency, must carry out its NEPA mandate to the fullest extent possible and this mandate includes weighing the environmental costs of the [project] even though the project has serious security implications.") (internal quotations and citations omitted) (alteration in original). Having violated NEPA, the Navy essentially argues that

ORDER – 7

it should be allowed to continue the expanded Growler operations under an unlawful EIS because of significant disruptions to national security. *See* Dkt. # 135 at 12-13; Dkt. # 135-2, ¶ 31.

The Court's role at this point is limited to determining whether the equities demand remand without vacatur. The information provided to the Court indicates that the Navy has operated FLCPs around pre-ROD levels in two of the last three years at Whidbey Island. *See* Dkt. 135-2, ¶ 31. And while OLF Coupeville may be the preferred location for these operations, the Navy has conducted FLCPs at locations other than Whidbey Island, and even at Ault Field on Whidbey Island. Dkt. # 62-2; Dkt. # 135-3, ¶ 14.  Yet, the Navy's submissions provide substantial support for the conclusion that the increased Growler presence for training at OLF Coupeville is essential for national security. *See, e.g.*, Dkt. # 135-2, ¶ 43 ("Any interruption to EA-18G training and operations, as would be experienced by re-locating the community elsewhere, would provide our adversaries an uninhibited strategic and tactical advantage which cannot be permitted to happen."); Dkt. # 135-3, ¶ 24 (stating that "[e]ven a temporary reduction will force the DOD to accommodate a critical degradation in a key [Airborne Electronic Attack] combat capability"). In this regard, as in *Winter*, the Court must greatly defer to senior military officials' professional judgments. Consistent with the Court's prior rulings on this issue, the equities and public interest weigh strongly in favor of remand without vacatur. *See Washington,* 2020 WL 8678103 at *6; *COER*, 122 F. Supp. 3d at 1085.

Finally, the Court is mindful of the admonition against imposing additional procedures on an agency's NEPA decision-making process. *See Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 548–49 (1978). COER requests the Court order the Navy to carry El Centro forward as a reasonable alternative, and that the Navy perform certain calculations with respect to greenhouse gas emissions. Dkt. # 128-1. The Court agrees that these requests are improper. The Navy "must have the discretion to rely on the reasonable opinions of its own qualified experts even if, as an

ORDER – 8

original matter, a court might find contrary views more persuasive." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989).

**V.      Conclusion**

For the foregoing reasons, the Court finds that remand without vacatur is appropriate and denies Federal Defendants' motion. Dkt. ## 129, 131.

DATED this 1st day of September 2023.

The Honorable Richard A. Jones
United States District Judge

ORDER – 9